**Willis KNIGHT, Petitioner,**

v.

**James J. WALSH, Respondent.**

**No. 03–CV–802S(F).**

United States District Court,
W.D. New York.

Dec. 17, 2007.

Willis Knight, Comstock, NY, pro se.

Michael C. Green, Monroe County District Attorney, Wendy Evans Lehmann, Assistant District Attorney, Rochester, NY, for Respondent.

## DECISION AND ORDER

WILLIAM M. SKRETNY, District Judge.

1. Petitioner commenced this action *pro se* on October 29, 2003, requesting habeas corpus relief under 28 U.S.C. § 2254. (Docket No. 1.)

2. The Court referred this matter to the Honorable Leslie G. Foschio, United States Magistrate Judge, to issue a Report and Recommendation for the consideration of the District Judge pursuant to 28 U.S.C. § 636(b)(1)(B).

3. In a 77–page Report and Recommendation dated September 26, 2007, Judge Foschio recommended that Knight's habeas Petition be dismissed. (Docket No. 11.)

4. On October 29, 2007, Petitioner filed a 71–page Objection to Judge Foschio's Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1)(C) and Local Rule 72.3(a)(3). (Docket No. 14.) Several weeks later, on November 21, 2007, Petitioner sought leave to amend his objections, claiming that paragraph "I" had been inadvertently omitted. (Docket No. 17.) Petitioner submitted his proposed amended Objection to the Report and Recommendation, numbering 73 pages, which has already been filed. (Docket No. 16.) Having compared the initial Objections and the proposed amendment, the Court grants Petitioner's request.

5. The Court has thoroughly reviewed this case *de novo* and has considered Judge Foschio's Report and Recommendation, Petitioner's Amended Objections thereto, and the applicable law. Upon due consideration, this Court will accept Judge Foschio's recommendation and deny the Petition for a writ of habeas corpus.

6. In addition, because the issues raised here are not the type of issues that a court could resolve in a different manner, and because these issues are not debatable among jurists of reason, the Court concludes that petitioner has failed to make a substantial showing of the denial of a constitutional right, 28 U.S.C. § 2253(c)(2), and accordingly the Court denies a certificate of appealability.

The Court also hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and therefore denies leave to appeal as a poor person. *Coppedge v. United States*, 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action. Requests to proceed on appeal as a poor person must be filed with the United States Court of Appeals for the Second Circuit in accordance with the requirements of Rule 24 of the Federal Rules of Appellate Procedure.

IT HEREBY IS ORDERED, that Petitioner's Request for Leave to Amend his Objections (Docket No. 16) is GRANTED.

FURTHER, that this Court accepts Judge Foschio's September 26, 2007 Report and Recommendation (Docket No. 11) in its entirety, including the authorities cited and the reasons given therein, and

Willis Knight's Petition for a Writ of Habeas Corpus (Docket No. 1) under 28 U.S.C. § 2254 is DENIED.

FURTHER, that a certificate of appealability is DENIED.

FURTHER, that leave to appeal as a poor person is DENIED.

FURTHER, that the Clerk of this Court is directed to take the necessary steps to close this case.

SO ORDERED.

## REPORT and RECOMMENDATION

LESLIE G. FOSCHIO, United States Magistrate Judge.

### *JURISDICTION*

Petitioner Willis Knight, acting *pro se*, commenced this action on October 29, 2003, requesting habeas corpus relief under 28 U.S.C. § 2254. On November 3, 2006, Honorable William M. Skretny referred the matter to the undersigned, pursuant to 28 U.S.C. § 636(b)(1)(B), for report and recommendation.

### *BACKGROUND*

On October 29, 2003, Petitioner Willis Knight ("Petitioner" or "Knight"), proceeding *pro se*, filed a Petition (Doc. No. 1) ("Petition"), commencing this action seeking habeas relief, challenging Petitioner's conviction on June 8, 1995 for the kidnapping, rape and murder of an 18–year old woman in Rochester, New York. Petitioner asserts 20 grounds for relief, arguing that his conviction and sentence are unconstitutional based on (1) unlawful arrest, Petition ¶ 12(A); (2) impermissibly suggestive identification procedures, Petition ¶ 12(B); (3) denial of right to conflict-free counsel, Petition ¶ 12(C); (4) an improperly impaneled trial jury, Petition ¶ 12(D); (5) use of inadmissible tape recordings and transcripts, Petition ¶ 12(E); (6) improper use of voice identification testimony, Petition ¶ 12(F); (7) introduction of impermissible DNA evidence at trial, Petition ¶ 12(G); (8) prosecutorial misconduct, Petition ¶ 12(H); (9) use of an "annotated" verdict sheet, Petition ¶ 12(I); (10) trial court judge's failure to recuse himself after the case was remanded for a reconstruction hearing regarding use of the annotated verdict sheet, Petition ¶ 12(J); (11) conflict of interest between the trial court judge and Petitioner, Petition ¶ 12(K); (12) withholding of exculpatory evidence by the prosecution, Petition ¶ 12(L); (13) ineffective assistance of appellate counsel, Petition ¶ 12(M); (14) the appellate court's failure to consider all supporting papers when ruling on Petitioner's motion for a writ of error *coram nobis*, Petition ¶ 12(N); (15) the jury's consideration of improper evidence during deliberations, Petition ¶ 12(O); (16) inadmissible fingerprint evidence, Petition ¶ 12(P); (17) failure to preserve evidence, Petition ¶ 12(Q); (18) insufficient evidence to support the verdict, Petition ¶ 12(R); (19) the imposition of consecutive sentences, resulting in an excessive sentence, Petition ¶ 12(S); and (20) ineffective assistance of trial counsel, Petition ¶ 12(T).

On February 6, 2004, Respondent filed a Response (Doc. No. 7) ("Response") opposing the Petition, attached to which are the first of two volumes of exhibits, A through V ("Vol. I, Response Exh(s). ___"). Also submitted was a second volume of exhibits, A through X ("Vol. II, Response Exh(s). ___"). The Response Exhibits are comprised of state court records pertaining to Petitioner's conviction, appeal of the conviction to the New York Supreme Court, Appellate Division, Fourth Department ("Appellate Division"), and motion for a writ of error *coram nobis*. On February 9, 2004, Respondent submitted five additional volumes of transcripts of Petitioner's state court proceedings including, *inter*

*alia,* arraignment, other pretrial proceedings, Petitioner's jury trial, and a reconstruction hearing. References to "SR Vol(s). ___, at ___" are to the particular page numbers and volumes of the five volumes of state records filed in this action.

On July 27, 2006, Petitioner filed a Traverse and Memorandum of Law (Doc. No. 9) ("Memorandum") in further support of the Petition. Attached to Petitioner's Memorandum are Exhibits A through E ("Petitioner's Exh(s). ___"). Oral argument was deemed unnecessary.

Based on the following, the Petition should be DISMISSED.

### FACTS[1]

Petitioner, Willis Knight ("Knight"), was arrested on May 13, 1994 in connection with the November 13, 1993 abduction, rape and murder of 18–year old college student Jennifer Koon ("the victim"), in Rochester, New York. The trial testimony established that at 11:30 A.M. on Saturday, November 13, 1993, the victim left her part-time job and drove to Pittsford Plaza in Pittsford, New York, a suburb of Rochester, where the victim purchased bagels and used an automatic teller machine ("ATM"), before returning to her vehicle intending to return to her college dorm. Trial Transcript[2] ("Tr.") at 933–36, 945–54, 1315–20. Instead, the victim was abducted by at least two men who drove the victim in her vehicle to Rochester, beating the victim during the drive. There were several witnesses to the beating who attempted to obtain aid for the victim by summoning the police. The witnesses reportedly observed the victim's vehicle traveling along Rochester streets, while a struggle ensued between the driver and the victim who was sitting in the front passenger seat. Tr. at 964–73, 977–84, 997–98, 1012–1025, 1068–75, 1101–08. During the ride, another male passenger sat in the vehicle's rear passenger seat. Tr. at 966–68, 978–86, 2199. At one point, the victim was observed hanging out the door of the moving vehicle as she tried to escape before the driver pulled the victim back into the vehicle, slamming the door on the victim's arms, and subsequently smashing the victim's head against the front passenger window so hard as to shatter the glass. Tr. at 964–73, 977–84, 997–98, 1012–25, 1068–75, 1101–08.

While being brutally beaten, the victim managed to dial 911 from a cell phone installed in the vehicle. Tr. at 907, 1479, 1503–06, 1511–23. The call was received on November 13, 1993, at the 911 emergency call center at 1:13 P.M. by telecommunicator Kimberly Bell ("Bell"), who was able to determine only that the call had been placed by a cell phone for which the location could not be determined. Tr. at 1479–80. According to Bell, the caller was "in trouble, someone that was hurt." Tr. at 1480. Bell described hearing a car radio or music, and a door or seatbelt chime with "lots of rustling noises." *Id.* Bell was never able to speak with the caller, but she kept the phone line open while she informed her supervisor about the call. *Id.* All communication transmissions to the 911 emergency call center were recorded to a "master tape." Tr. at 1481. The line was left open for 15 minutes. Tr. at 1481, 1485.

Despite the victim's emergency 911 call, the police did not reach the victim in time to save her. The victim's body, slumped in

---

1. Taken from the Petition, Response, Memorandum, exhibits and state court records filed in this action.

2. The Trial Transcript is contained in SR Vols. II through V.

the front passenger seat with her head hanging out the shattered passenger window, was found by Rochester Police at approximately 1:25 P.M. on Orpheum Alley in Rochester. Vol. II, Response Exh. B. An autopsy revealed the victim had been raped, suffered blunt force trauma injuries to her face and arms, multiple bodily abrasions and contusions, and was shot three times with a rifle, including shots to the middle of her forehead, the back of her head, and in her left upper back. Tr. at 1351–54, 1356–73, 1377–78. The victim's feet were dirty and bloodstained and traces of brick residue and soil and plant debris found on her clothing, including her panties, indicated the victim had been removed from the vehicle, raped on the ground, and then placed back inside the vehicle. Tr. at 1170, 1354, 1545, 1550–53, 2481–83.

Voices on the 911 emergency call tape were later identified as belonging to the victim, Petitioner, and Petitioner's stepbrother, Reginald McGriff ("McGriff"). Tr. at 2202–04. One witness, Katrina Williams ("Williams"), identified McGriff, with whom Williams had been acquainted for four or five years prior to November 13, 1993, as the passenger in the vehicle's back seat who handed a rifle to the driver before exiting the car. Tr. at 980–82. After exiting the vehicle, Williams greeted McGriff, asking "hey Reggie, what's going on? Are you in trouble? Something is not right," to which McGriff responded, "no, I am all right." Tr. at 982–84.

Upon investigating the murder, investigators from the Physical Crimes Unit originated a surveillance detail to gather information regarding McGriff. Vol. II, Response Exh. B. Observed with McGriff were Damian Smith ("Damian Smith"), Christopher Knight, a/k/a Christopher Cooper, and Eugene Knight, a/k/a Eugene French. Vol. II, Response Exh. B. Chris-topher and Eugene Knight and McGriff are Petitioner's half-brothers. *Id.*

On November 13, 1993, Robert Geer ("Geer") contacted the Rochester Police regarding the murder. Vol. I, Response Exh. D at 27. On November 14, 1993, Investigator Campione met with Geer and obtained a statement regarding Geer's observations of the incident prior to the victim's murder. *Id.*

On November 14, 1993, McGriff was brought to the Rochester Police Department for questioning about the murder. Vol. II, Response Exhs. A at 3 and B. McGriff, who was not arrested at that time, stated that at the time of the crime, McGriff had been a passenger in the victim's vehicle driven by an individual known to McGriff only as "Dee" or "D," that the victim was seated in the front passenger seat, and that another black male passenger, unknown to McGriff, was seated in the rear seat. *Id.* McGriff, who was not arrested at that time, was informed he was free to leave when the interrogation ended. Vol. II, Response Exh. B.

Later in the investigation, on April 12, 1994, Petitioner's half-brother, Eugene French ("French"), contacted the Physical Crimes Unit of the Rochester Police Department and offered to provide information concerning the victim's murder, in exchange for police assistance in obtaining the dismissal of unrelated charges then pending against French. Officers from the Physical Crimes Unit, including Sergeant Merklinger ("Sgt. Merklinger") and Investigator Terrance Sheridan ("Inv. Sheridan") met with French who described a conversation between French and another brother, Christopher Cooper ("Cooper") in which Cooper informed French that Cooper had recognized Petitioner's voice on a tape of a 911 emergency call originating from the victim's vehicle just prior to her murder. According to Sgt. Merkling-

er, the 911 tape had been played for Cooper, who declined to cooperate with the investigation. Sgt. Merklinger and Inv. Sheridan spoke with French again on April 27, 1994, when French stated that another brother, McGriff, told French that he was with Petitioner in the victim's vehicle on November 13, 1993, and that Petitioner later admitted to McGriff having killed the victim.

On May 12, 1994, McGriff was arrested on drug charges unrelated to the victim's abduction, rape and murder, and was transported to the Rochester Public Safety Building where McGriff was initially interrogated by Investigators Sheridan, Coleman ("Inv. Coleman"), Campione ("Inv. Campione"), and Schultz ("Inv. Schultz"), during which McGriff maintained that Petitioner was not involved in the victim's homicide, but that a person named "D" from New York City had committed the murder. McGriff was later interrogated by Investigators Evelyn Beaudrault ("Inv. Beaudrault") and Vito D'Ambrosia ("Inv. D'Ambrosia"), and initially continued to deny that Petitioner was involved in the victim's murder. As the interrogation continued, however, McGriff acknowledged that Petitioner, rather than "D" had committed the murder. McGriff explained that on November 13, 1993, McGriff, while inside Petitioner's residence, peered out a window and observed Petitioner seated behind the steering wheel of the victim's vehicle, in which the victim was seated in the front passenger seat. At Petitioner's urging, McGriff retrieved Petitioner's .22 caliber rifle from inside the home, and brought it outside to the victim's car which McGriff then entered, sitting in the back seat. Petitioner then drove off in the vehicle, urging McGriff to shoot the victim. When McGriff refused, Petitioner grabbed the rifle from McGriff, and McGriff exited the vehicle. McGriff stated that when he encountered Petitioner later that same day, Petitioner admitted having killed the victim by shooting her in the head. McGriff's statement was reduced to a written statement which McGriff signed and McGriff then submitted to a polygraph test. When the results of the polygraph test indicated that McGriff's recollection of the subject events was not entirely accurate, McGriff's statement was amended. In both the first and second statements, McGriff identified Petitioner as the victim's killer.

At 9:30 A.M. on May 13, 1994, Petitioner was riding in a vehicle driven by another brother of Petitioner, Christopher Knight ("Christopher Knight"), when the vehicle was stopped on North Street, in Rochester, by several Rochester Police Officers, including Sergeant Gerbino ("Sgt. Gerbino"), and Officer Robert Peterson ("Officer Peterson"). Officer Peterson informed Christopher Knight and Petitioner the stop was to check the vehicle's registration to determine whether it had been stolen. At the officers' request, Petitioner exited the vehicle,. and was then arrested, handcuffed and transported to the Public Safety Building for requesting regarding the victim's murder. It is undisputed that no warrant had issued for Petitioner's arrest.

Upon arriving at the Public Safety Building, Petitioner was interrogated by Investigators Campione and Sheridan. Inv. Sheridan read Petitioner his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ("*Miranda* warning" or "*Miranda* rights"). Petitioner, upon acknowledging he understood his *Miranda* rights, agreed to answer questions, but stated he would refuse to answer any questions he did not wish to answer. Petitioner was then interrogated from 10:40 A.M. to 10:10 P.M. on May 13, 1994, with breaks to use the bathroom and refreshments. Throughout the interrogation, Petitioner refused the officers' re-

quests to submit to a polygraph test and continued to deny any knowledge of the victim or involvement in her murder. At the end of the interrogation, Sgt. Merklinger advised Petitioner that he was being arrested for the victim's murder.

On May 13, 1994, Damian Smith was taken from his school and questioned by police regarding the incident. Vol. II, Response Exh. B; Tr. at 2211–13. The audiotape of the 911 emergency call was played for Damian Smith who identified two male voices heard on the tape as belonging to Petitioner and McGriff. Vol. II, Response Exh. B; Tr. at 2203–04, 2213. Smith also stated that in November 1993, after hearing rumors that McGriff was involved in the murder, Smith asked McGriff if the rumors were true, and McGriff admitted being in the victim's vehicle while Petitioner was driving, but that he, McGriff, had exited the vehicle prior to the murder. *Id.* McGriff also instructed that if Smith were interrogated about the murder, Smith should state that he heard someone named "Dee" committed the murder. *Id.* Smith identified Petitioner as the victim's killer, and submitted to the taking of pubic and head hair samples and a voice exemplar.

On May 16, 1994, Inv. Campione met with Geer, an eyewitness who had initially contacted the police on November 13, 1993, for the purpose of showing Geer a photo array consisting of six colored photographs of black males, including a photograph of Petitioner taken at the time of Petitioner's arrest. Vol. I, Response Exh. D at 27. When asked if he could identify any of the men depicted in the photo array as the one Geer observed assaulting the victim on November 13, 1993, Geer pointed to Petitioner's photo, but stated he recalled the attacker as having longer hair and no facial hair compared to Petitioner's appearance at the time of his arrest six months later. *Id.* at 27–28. Geer also denied having seen or heard any of the numerous media reports regarding the murder. *Id.* at 27.

Later that same day, Sgt. Merklinger and Lieutenant Tom Jones ("Lt. Jones") met with Michael Smith ("Michael Smith"), another eyewitness, from whom a supporting deposition was then obtained. Vol. I, Response Exh. D at 28. Upon being shown the same photo array previously shown to Geer, Michael Smith pointed to Petitioner's photo as depicting the driver of the victim's vehicle, although, like Geer, acknowledged that Petitioner did not have facial hair on November 13, 1993, and that Petitioner's hair in the photo was different. *Id.* at 28–29. Michael Smith further stated he recognized Petitioner from observing Petitioner on prior occasions drinking beer in the neighborhood. *Id.* at 29.

On May 20, 1994, a Monroe County grand jury returned indictment No. 94/356, charging Petitioner with one count of Intentional Murder, in violation of New York Penal Law ("N.Y. Penal Law")[3] § 125.25[1], based on the shooting death of the victim, and one count of Felony Murder, in violation of N.Y. Penal Law § 125.25[3], based on the fact that the victim's murder occurred during her abduction. Vol. I, Response Exh. D. At his arraignment on the charges before New York Supreme Court Justice Francis A. Affronti ("Justice Affronti"), on May 24, 1994, Petitioner, represented by assigned counsel Assistant Monroe County Public Defender Jeffrey A. Jacobs ("Jacobs"), entered pleas of not guilty to both counts. May 24, 1994, Arraignment Tr.[4] at 1–3.

---

**3.** Unless otherwise indicated, references to "N.Y. Penal Law" are to "McKinney 2004."

**4.** References to "May 24, 1994 Arraignment Tr." are to the transcript of Petitioner's ar-

Petitioner's request to be released on his own recognizance was denied, and bail was set in the amount of $ 150,000. *Id.* at 15.

Prior to trial, Petitioner filed an omnibus motion seeking, *inter alia,* suppression of testimony regarding any statements Petitioner made to law enforcement officers as not voluntarily made and obtained as a result of an arrest made without probable cause, suppression of identification testimony by witnesses, and suppression of tangible evidence seized pursuant to a search warrant. Vol. I, Exh. D. Following oral argument on the omnibus motion on August 9, 1994, a suppression hearing ("suppression hearing") pursuant to *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979),[5] *People v. Huntley,* 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965),[6] and *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967),[7] was ordered and held on September 19, 20, and 22, Suppression Tr.[8] 1, October 6, 1994, Suppression Tr. 2, and October 7, 1994. Suppression Tr. 3. Testifying at the suppression hearing on the prosecution's behalf were Inv. Beaudrault, Suppression Tr. 1 at 16–77, Officer Peterson, *id.* at 79–99, Sgt. Merklinger, *id.* at 100–242, Inv. Campione, *id.* at 243–327, Inv. Montalvo, *id.* at 328–42, and Inv. Sheridan, *id.* at 348–400; Suppression Tr. 2 at 4–56. Testifying for Petitioner were Inv. D'Ambrosia, Suppression Tr. 2 at 57–69, Inv. Schultz, *id.* at 70–

84, and Inv. Siersma, Suppression Tr. 3 at 3–8.

In a Decision and Order dated December 22, 1994 ("December 22, 1994 Decision and Order") (Vol. I, Response Exh. D), Justice Affronti found the identification of Petitioner by two witnesses, Geer and Michael Smith, to be admissible at trial. December 22, 1994 Decision and Order at 10–13. Both Geer and Smith had identified Petitioner as the driver of the victim's vehicle on November 13, 1993, upon observing separate photo arrays. *Id.* Justice Affronti further found probable cause existed for Petitioner's warrantless arrest on May 13, 1994, such that there was no basis to suppress statements Petitioner made following his arrest, pursuant to *Dunaway, supra. Id.* at 13–18. Petitioner's motion to suppress statements made following his arrest as not voluntarily given was denied. *Id.* at 18–19. Petitioner's motion was also denied insofar as Petitioner challenged the photo arrays shown to Geer and Smith as impermissibly suggestive, and tainted as a result of pretrial media coverage. *Id.* at 19–22.

On December 23, 1994, a second indictment was returned against Petitioner, No. 94/883, charging Petitioner with one count of Rape in the First Degree in violation of N.Y. Penal Law § 130.35(1). Vol. I, Response Exh. D; January 5, 1995 Arraign-

---

raignment on May 24, 1994 on Indictment No. 356/94, found in SR Vol. I.

**5.** In a pretrial *Dunaway* hearing, the trial judge determines whether probable cause existed for the defendant's arrest.

**6.** In a pretrial *Huntley* hearing, the trial judge considers the voluntariness of inculpatory statements made by the defendant to law enforcement officers.

**7.** In a pretrial *Wade* hearing, the trial judge determines whether the pretrial identification of the defendant resulted from impermissibly

suggestive law enforcement procedures and, thus, should be suppressed.

**8.** References to "Suppression Tr. ___" are to the transcript of the suppression hearing held on September 19, 20, and 22. Specifically, the transcript of the suppression hearing is contained in SR Vol. 1, with Suppression Tr. 1 pertaining to September 19, 20 and 22, Suppression Tr. 2 pertaining to October 6, 1994, and Suppression Tr. 3 pertaining to October 7, 1994.

ment Tr.[9] at 2. Petitioner was arraigned on the charge on January 5, 1995, before Justice Affronti, and pleaded not guilty. *Id.* at 3. Justice Affronti consolidated the two indictments, Nos. 94/365 and 94/883, for trial. January 17, 1995, Decision and Order, Vol. I, Response Exh. D.

A jury trial on the three charges commenced on March 27, 1995, and concluded on April 20, 1995. Justice Affronti presided over the trial, at which Jacobs represented Petitioner and Assistant Monroe County District Attorney Richard A. Keenan was the prosecutor. Testimony was presented by five witnesses, including Luz Sierra ("Sierra"), Katrina Williams ("Williams"), Alethea Sutton ("Sutton"), Michael Smith, and Geer, who witnessed the assault of the victim while being driven through the streets of Rochester just prior to her death. Tr. at 964–77 (Sierra), 977–95 (Williams), 995–1012 (Sutton), 1012–65 (Michael Smith), and 1101–35 (Geer). All five witnesses testified to observing a maroon vehicle, matching the description of the victim's vehicle, being driven along Rochester streets near Orpheum Alley with a white, female passenger, who appeared to be hurt, struggling with the driver and hanging out the open front passenger door. All five witnesses also observed other occupants of the vehicle, a black male driver and a black male back seat, driver's side passenger. The driver was driving with one hand, while holding the female by the back of her shirt, while the back seat passenger just sat. The eyewitnesses all reported hearing loud voices coming from the vehicle indicating the vehicle's occupants were arguing. At one point, the vehicle stopped, the back seat passenger exited through the rear driver's side door, and the vehicle then resumed driving.

One witness, Williams, testified she recognized McGriff as the back seat passenger because she had been acquainted with McGriff for four or five years. Tr. at 980. Williams also saw McGriff, while seated in the vehicle's rear seat, hand a rifle to the driver. *Id.* at 981–83. Michael Smith testified he chased the vehicle on foot and got "a good look" at the driver's face three times upon approaching the vehicle as it slowed to turn corners, and identified Petitioner as the driver. *Id.* at 1016–18. Geer testified that he chased the vehicle on foot and, when the vehicle stopped at a stop sign, got "a good look at the driver's face" from less than 10 feet away, and identified Petitioner as the driver. Tr. at 1106–08.

A sixth witness, Dr. Robert Charles Thomson ("Dr. Thomson"), testified that while driving along a city street in Rochester, he observed the victim's vehicle being driven erratically, almost causing an accident. Tr. at 1067–85. Dr. Thomson observed only one occupant in the vehicle, a black male driver, but also observed the window on the front passenger door shatter and fall out. *Id.* A seventh witness, Obry Evans ("Evans"), observed the victim's car being driven into Orpheum Alley and a single black male exiting the vehicle from the front driver's side, carrying a white plastic bag. Tr. at 1085–1100.

The location of fingerprint evidence presented at the trial indicated Petitioner had been in the driver's seat of the victim's vehicle and DNA evidence presented at trial indicated Petitioner had raped the victim. Tr. at 2429, 1707–19, 2007–25. Prior to trial, the prosecutor and defense counsel stipulated that the female voice heard on an audiotape of the 911 emergency call belonged to the victim. Tr. at 2503. Damian Smith testified that Petitioner's

---

**9.** References to "January 5, 1995 Arraignment Tr." are to the transcript of Petitioner's arraignment on January 5, 1995 on Indictment No. 883/94, in SR Vol. I.

and McGriff's voices were also heard on the audiotape. Tr. at 2202–04. Smith also testified that shortly after the murder, Petitioner painted his own vehicle, changing its color from white to gray. Tr. at 2201–02.

Testifying at trial on Petitioner's behalf were several of Petitioner's relatives, including his son Rodney Knight, and Petitioner's common law wife, Cathy Watson. The defense witnesses all consistently testified that on November 13, 1993, Petitioner was at home between noon and 1:00 P.M., that Petitioner's vehicle was in the driveway with a flat tire, and that Petitioner's voice was not heard on the 911 emergency call audiotape. Tr. 2530–34, 2547–49, 2561–64, 2572–73, 2576–79.

Following the trial, Petitioner was convicted on all three counts. On June 8, 1995, Petitioner was sentenced to concurrent terms of 25 years to life on each of the two murder convictions, and to a consecutive term of 12½ to 25 years on the rape conviction.

On June 9, 1995, Petitioner, through his trial counsel Jacobs, appealed his conviction to New York Supreme Court, Appellate Division, Fourth Department ("Appellate Division"). Vol. I, Response Exh. A.

While Petitioner's appeal was pending before the Appellate Division, on October 8, 1996, Petitioner filed his first motion seeking relief pursuant to New York Criminal Procedure Law ("N.Y.Crim.Proc. Law") § 440.10 ("McKinney 2005") ("§ 440.10") ("First § 440 Motion"). Vol. II, Response Exh. A. Specifically, Petitioner sought to vacate the conviction based on ineffective assistance of trial counsel, given that Jacobs (1) failed to move for a change of venue despite heavy local media coverage of the case; (2) did not properly prepare for pretrial suppression hearings; (3)

failed to obtain certain material evidence prior to trial; (4) coerced Petitioner into waiving his right to a hearing pursuant to *People v. Castro*, 143 Misc.2d 276, 540 N.Y.S.2d 143 (S.Ct., Bronx Co.1989) (requiring pretrial hearing be held to determine admissibility of new scientific evidence); (5) neglected to call an expert to challenge the DNA evidence, or to take steps to safeguard against the tampering of certain evidence; (6) failed to conduct any investigation designed to elicit exculpatory evidence; (7) neglected to formulate a defense strategy to challenge certain evidence, including DNA evidence and a tape recording; (8) failed to object, during the trial, to the prosecutor's prejudicial actions, remarks and statements; and (9) neglected to prepare known defense and alibi witnesses for trial.

On December 11, 1996, Petitioner's First § 440 Motion was denied by Justice Affronti. Vol. II, Response Exh. E.[10] Specifically, Justice Affronti found § 440.10(2)(b) mandated denial of Petitioner's First § 440 Motion grounds 1, 3, 4, 5, 7 and 8 because the issues raised in each ground of the First § 440 Motion could have been presented on Petitioner's direct appeal to the Appellate Division, but were not. *Id.* Justice Affronti further found that even if there were any truth to the facts alleged in support of the First § 440 Motion grounds 2, 6 and 9, such would not entitle Petitioner to the requested relief. *Id.* On December 27, 1996, Petitioner appealed Justice Affronti's denial of the First § 440 Motion to the Appellate Division. Vol. II, Response Exh. G. Petitioner's application for leave to appeal to the Appellate Division, Fourth Department was initially denied on March 26, 1997 and, upon reconsideration, on October 18, 1999. *Id.*

**10.** Justice Affronti's denial of Petitioner's First § 440 Motion is not a reported decision.

On June 10, 1998, Petitioner moved to disqualify Jacobs as his appellate counsel for his pending appeal to the Appellate Division, based on a conflict of interest because Petitioner desired to raise ineffective assistance of trial counsel as a ground for the pending appeal. Vol. I, Response Exh. B. The motion was initially denied on August 28, 1998, but then granted on March 1, 1999, when Garry Stephen Hanlon, Esq. was appointed to represent Petitioner on his appeal to the Appellate Division. *Id.*

On July 7, 2000, the Appellate Division remitted Petitioner's conviction to Supreme Court for further proceedings to determine whether defense counsel had approved the annotated verdict sheet used at Petitioner's trial. *People v. Knight,* 274 A.D.2d 957, 710 N.Y.S.2d 827, and 274 A.D.2d 957, 711 N.Y.S.2d 811 (App. Div. 4th Dep't 2000). Following a reconstruction hearing,[11] Justice Affronti determined that Petitioner, through his trial attorney, had consented to use of the annotated verdict sheet. *People v. Knight,* 280 A.D.2d 937, 721 N.Y.S.2d 166, 170 (App. Div. 4th Dep't 2001). Following the court's consideration of the result of the reconstruction hearing, the Appellate Division affirmed all three of Petitioner's convictions. *People v. Knight,* 280 A.D.2d 941, 719 N.Y.S.2d 917, and 280 A.D.2d 937, 721 N.Y.S.2d 166 (App. Div. 4th Dep't 2001) (*"Knight I"*). Leave to appeal to the New York Court of Appeals ("Court of Appeals") was denied on June 29, 2001. *People v. Knight,* 96 N.Y.2d 864, 730 N.Y.S.2d 38, 754 N.E.2d 1121 (2001).

On August 16, 2001, Petitioner filed his second motion seeking post-conviction relief pursuant to § 440.10 ("Second § 440 Motion"). Vol. II, Response Exh. H. Specifically, Petitioner sought to vacate his convictions, asserting as grounds for relief

(1) a conflict of interest within the trial court when Justice Affronti failed to recuse himself despite the fact that, during the trial, Justice Affronti's wife appeared in the courtroom in the company of the victim's family, and prosecution witness Damian Smith was observed in the courthouse cafeteria with the victim's family; and (2) denial of due process based on the prosecution's withholding of exculpatory evidence. On November 14, 2001, Petitioner's Second § 440 Motion was denied by Justice Affronti, Vol. II, Response Exh. J, based on the reasons set forth in the opposing Affirmation of Assistant Monroe County District Attorney Stephen K. Lindley ("Lindley"), dated October 31, 2001 ("Lindley Affirmation"). Vol. II, Response Exh. I. In his affirmation, Lindley argued that Petitioner had defaulted on the Second § 440 Motion's first ground for relief alleging failure to recuse based on conflicts of interest given that such ground could have been raised in the First § 440 Motion and Petitioner never preserved the objection for the record, such that the claim is now procedurally barred pursuant to § 440.10(3)(c) and § 440.30(2), and, in any event, Petitioner had failed to either specify the statutory basis for such claim or make any factual assertions as to how Justice Affronti's alleged failure to recuse himself resulted in any prejudice to Petitioner. Lindley Affirmation ¶¶ 3–17. As to Petitioner's Second § 440 Motion's second ground for relief claiming denial of due process because exculpatory evidence had been withheld from Petitioner, Lindley maintained that Petitioner's factual assertions and legal conclusions were incorrect because Petitioner was aware the subject evidence, *i.e.,* a videotape of the WHEC–TV broadcast news interview in which McGriff and Damian Smith recanted earli-

---

11. A transcript of the August 14, 2000 reconstruction hearing is in SR Vol. 1.

er statements provided to the police inculpating Petitioner in the murder, existed and had, in fact, seen the allegedly withheld evidence, that Petitioner's due process claim could have been raised in Petitioner's First § 440 Motion, and as such is now procedurally barred. *Id.* ¶¶ 18–28.

On December 4, 2001, Petitioner appealed the denial of his Second § 440 Motion to the Appellate Division. Vol. II, Response Exh. K. Petitioner's application for leave to appeal to the Appellate Division was denied on October 3, 2002. Vol. II, Response Exh. Q.

On October 30, 2002, Petitioner moved for a writ of error *coram nobis* ("*coram nobis* motion") before the Appellate Division based on ineffective assistance of appellate counsel. Vol. II, Response Exh. R. Asserted as grounds for the writ were that appellate counsel, Hanlon, filed an inadequate brief on Petitioner's direct appeal, advancing only weak arguments and failing to address several meritorious arguments including (1) Petitioner's conviction on two counts of murder stemming from the same incident violated the merger doctrine [12];(2) pursuant to the merger doctrine and N.Y. Penal Law § 70.25(2), the sentence imposed for the rape conviction should run concurrent with the two sentences imposed for the two murder convictions; (3) the trial prosecutor's failure to present any evidence that the victim was kidnapped required dismissal of the second count of the first indictment, No. 94/356, charging Petitioner with felony murder; and (4) appellate counsel made erroneous statements in the brief undermining Petitioner's alibi. The *coram nobis* motion was denied by the Appellate Division on February 7, 2003.

*People v. Knight,* 302 A.D.2d 1020, 753 N.Y.S.2d 417 (App.Div. 4th Dep't.2003); Vol. II, Response Exh. V. On March 14, 2003, Petitioner moved to reargue the *coram nobis* motion, Vol. II, Response Exh. W, and that request was denied by the Appellate Division on May 2, 2003. *Id.* Leave to appeal to the Court of Appeals, filed February 19, 2003, was denied on April 22, 2003. *People v. Knight,* 99 N.Y.2d 656, 760 N.Y.S.2d 120, 790 N.E.2d 294 (2003); Vol. II, Response Exh. X. This habeas action followed.

## DISCUSSION

### 1. Standard of Review

In reviewing a state prisoner's petition pursuant to 28 U.S.C. § 2254, a district court makes an independent determination as to whether the petitioner is in custody in violation of his rights under the Constitution or any laws or treaties of the United States. *Coleman v. Thompson,* 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), *reh'g denied,* 501 U.S. 1277, 112 S.Ct. 27, 115 L.Ed.2d 1109 (1991). A state petitioner's federal habeas corpus petition may be dismissed if the petitioner has not exhausted available state remedies as to any of his federal claims, *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982), although under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court is permitted to deny a state prisoner's habeas corpus petition on the merits even though the prisoner has not exhausted available state remedies. 28 U.S.C. § 2254(b)(2).

---

**12.** The merger doctrine applies where the elements of the lesser crime are all contained within the elements of a greater crime, such that the lesser crime merges into the greater crime and the defendant may be punished for only the greater crime. *See People v. Gonzalez,* 80 N.Y.2d 146, 589 N.Y.S.2d 833, 837, 603 N.E.2d 938, 942 (1992) (holding abduction of victim constituted discrete crime of kidnapping, which did not merge with attempted rape charge).

In reviewing habeas petitions, federal courts do not function as appellate courts to review matters within the jurisdiction of the state, or to review specific rulings and decisions of state trial and appellate courts not involving federal constitutional issues; rather, the court determines whether the proceedings in the state court amount to a violation of federal constitutional rights. *Coleman,* 501 U.S. at 729, 111 S.Ct. 2546. Federal review of a state court conviction is limited to errors of federal constitutional magnitude which denied a criminal defendant the right to a fundamentally fair trial. *Cupp v. Naughten,* 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). Pursuant to 28 U.S.C. § 2254(e), formerly 28 U.S.C. § 2254(d), the state court's determination as to evidentiary matters is presumed to be correct unless the federal habeas court concludes that the relevant state court determination is not fairly supported by the record. *Sumner v. Mata,* 449 U.S. 539, 546–47, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). Otherwise, the burden rests on the petitioner to establish, by clear and convincing evidence, that the factual determination is erroneous. 28 U.S.C. § 2254(e)(1). Further, § 2254(e) applies, by its terms, "to factual determinations made by state courts, whether the court be a trial court or an appellate court." *Sumner,* 449 U.S. at 547, 101 S.Ct. 764.

■ A state prisoner applying for a writ of habeas corpus under 28 U.S.C. § 2254 is not entitled to an evidentiary hearing by the federal court, but the granting of a hearing is within the discretion of the federal district court. *Pagan v. Keane,* 984 F.2d 61, 63 (2d Cir.1993); *Keeney v. Tamayo–Reyes,* 504 U.S. 1, 4–5, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992) (citing *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963)). The state court's determination is, however, presumed to be correct unless the federal

habeas court concludes that the relevant state court determination is not fairly supported by the record. *Sumner,* 449 U.S. at 539, 546–47, 101 S.Ct. 764. Absent these factors, the burden rests on the petitioner to establish, by clear and convincing evidence, that the factual determination is erroneous. *Id.*

In the instant case, the court is in possession of the complete state record, including the motion, hearings and trial transcripts as well as the briefs filed in connection with Petitioner's direct appeal to the Appellate Division and his motions for post conviction relief, including pursuant to N.Y.Crim. Proc. Law § 440.10, and writ of error *coram nobis.* Petitioner has not requested that the court conduct an evidentiary hearing prior to resolving his claims for relief and has not challenged the record below as inaccurate. Accordingly, the court in its discretion finds an evidentiary hearing unnecessary.

Pursuant to 28 U.S.C. § 2254, as amended by AEDPA, a federal court must give substantial deference to a state court determination that has "adjudicated [the federal constitutional claim] *on the merits.*" 28 U.S.C. § 2254(d) (italics added); *Sellan v. Kuhlman,* 261 F.3d 303, 309–10 (2d Cir. 2001). Specifically, AEDPA requires that where a state court has adjudicated the merits of a petitioner's federal claim, habeas corpus relief may not be granted unless the state court's adjudication

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) ("§ 2254(d)").

■ In *Williams v. Taylor,* 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389

(2000), the Supreme Court interpreted the phrases, as used in § 2254(d), "contrary to" and "an unreasonable application of clearly established Federal law." According to the Court, a state court decision is "contrary to clearly established Federal law," 28 U.S.C. § 2254(d)(1), "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413, 120 S.Ct. 1495. A state court decision involves "an unreasonable application" of Supreme Court caselaw if it "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* Both AEDPA, and its predecessor statute, recognize that a presumption of correctness shall apply to state court findings of fact. *Whitaker v. Meachum*, 123 F.3d 714, 715 n. 1 (2d Cir. 1997). AEDPA also requires a petitioner to rebut that presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *LanFranco v. Murray*, 313 F.3d 112, 117 (2d Cir.2002). A presumption of correctness applies to findings by both state trial and appellate courts. *Galarza v. Keane*, 252 F.3d 630, 635 (2d Cir.2001); *Whitaker*, 123 F.3d at 715 n. 1.

A federal habeas court must apply the § 2254(d) deferential review standard where the state court has "adjudicated [the federal claim] on the merits." 28 U.S.C. § 2254(d). If the claims have not been adjudicated on the merits, the federal court applies the pre-AEDPA *de novo* review standard, even where the petition was

filed after the effective date of the statute.[13] *See Sellan*, 261 F.3d at 314; *Boyette v. Lefevre*, 246 F.3d 76, 89, 91 (2d Cir.2001).

In *Sellan*, the Second Circuit held that a federal claim is adjudicated on the merits when the state court "(1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment." *Sellan*, 261 F.3d at 312. In other words, in order to invoke the deferential review standards of § 2254(d)(1), "the state court need only dispose of the [p]etitioner's federal claims on substantive grounds, and reduce that disposition to judgment. No further articulation of its rationale or elucidation of its reasoning process is required." *Aparicio v. Artuz*, 269 F.3d 78, 93–94 (2d Cir.2001), citing *Sellan*, 261 F.3d at 312. If there is no indication that the federal claim has been decided solely on state procedural grounds, the federal claim will be considered to have been adjudicated on the merits. *Brown v. Artuz*, 283 F.3d 492, 498 (2d Cir.2002). Put another way, the failure to state specific reasons for a state court adjudication on federal claims raised on appeal does not avoid a finding that the state court determination was on the merits of each federal ground presented to the appellate court for purposes of applying AEDPA's deferential standards. *See, e.g., Brown*, 283 F.3d at 498 ("[b]ecause there is no basis either in the history of the case or the opinion of the Appellate Division for believing that [petitioner's] Sixth Amendment claim was denied on procedural or any other nonsubstantive grounds, we find that his claim was 'adjudicat[ed] on the merits' by the

---

**13.** The AEDPA applies to petitions filed on or after the statute's April 24, 1996 effective date. *See, e.g., Williams v. Taylor*, 529 U.S. 362, 402, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O'Connor, J., writing for the majority); *Lindh v. Murphy*, 521 U.S. 320, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *Smith v. McGinnis*, 208 F.3d 13, 15 (2d Cir.2000) (*per curiam*), *cert. denied*, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 63 (2000). Thus, the AEDPA applies to the instant petition.

state court, and therefore review his Sixth Amendment claim under the more deferential standard set forth in § 2254.") (citing *Sellan*, 261 F.3d at 314).

In the instant case, the record establishes that the Appellate Division decided all of Petitioner's present claims which Petitioner presented to it on the merits when it unanimously affirmed his conviction. *Knight*, 721 N.Y.S.2d at 168–70. Although the Appellate Division's decisions do not state all of its reasons for its decisions rejecting Petitioner's appeals, there is also no indication that the claims raised on Petitioner's direct appeal, § 440 Motions and *coram nobis* motion were decided by the appellate court only on state procedural grounds. *See Brown*, 283 F.3d at 498.

### 2. *Timeliness of Petition*

Review of federal habeas corpus petitions filed by state prisoners on or after April 24, 1996, is governed by the AEDPA, which provides a one-year statute of limitations for the filing of habeas petitions. 28 U.S.C. § 2244(d)(1). The limitations period, where petitioner is in custody pursuant to the judgment of a state court, runs from the latest of four dates. 28 U.S.C. § 2244(d)(1) (A–D). The one-year period of limitations is tolled for periods of time during which a properly filed application for state post-conviction relief is pending, although the limitations period is not tolled during the pendency of a petition for *certiorari* to the Supreme Court seeking review of the denial of state postconviction relief. 28 U.S.C. § 2244(d)(2); *Lawrence v. Florida*, —— U.S. ——, 127 S.Ct. 1079, 1082–83, 166 L.Ed.2d 924 (2007); *Bennett v. Artuz*, 199 F.3d 116, 118–19 (2d Cir. 1999).

In the instant case, the applicable date is "the date on which the judgment became final by the conclusion of direct review or the expiration of time for seeking such review." 28 U.S.C. § 2244(d) (1)(A). Specifically, Petitioner's conviction became final on September 27, 2001, 90 days after the New York Court of Appeals denied Petitioner's request for leave to appeal on June 29, 2001, during which Petitioner could have sought further direct review by filing a petition for a writ of certiorari with the United States Supreme Court. *Lawrence*, 127 S.Ct. at 1083. Accordingly, to be timely, Petitioner's habeas petition generally would have had to have been filed by September 27, 2002. The pendency of Petitioner's Second § 440 Motion and *coram nobis* motion on September 27, 2001, however, tolled the running of the one year limitations period. 28 U.S.C. § 2244(d)(2); *Bennett*, 199 F.3d at 118–19. Because leave to appeal the *coram nobis* motion was denied by the Court of Appeals on April 22, 2003, the Petition, filed October 29, 2003, was filed within AEDPA's one-year filing period, and thus is timely.

### 3. *Exhaustion and Procedural Bar*

Federal habeas review can be foreclosed either by a failure to exhaust all available state court remedies, or by a federal or state procedural bar to the assertion of a federal question. A brief overview of how a federal habeas claim may be foreclosed under each situation is provided.

 A state procedural bar can bar subsequent federal habeas review of a federal question. *Garvey v. Duncan*, 485 F.3d 709, 713–20 (2d Cir.2007) Where " 'the decision of a state court rests on a state law ground that is independent of the federal question and adequate to support the judgment,' " federal courts generally will not consider a federal constitutional issue raised in a habeas petition. *Garvey*, 485 F.3d at 713 (quoting *Lee v. Kemna*, 534 U.S. 362, 375, 122 S.Ct. 877, 151 L.Ed.2d 820 (2002)). This rule foreclosing federal review applies regardless of wheth-

er the independent state law ground is substantive or procedural and whether the case is in federal court on direct review or from state court upon a habeas petition, and provided the asserted state law ground is " 'firmly established and regularly followed by the state.' " *Id.* (quoting and citing *Lee*, 534 U.S. at 376, 122 S.Ct. 877). Nevertheless, such "firmly established and regularly followed" state rules will not foreclose review of a federal claim if the application of the rule in a particular case is "exorbitant," based on consideration of three factors which, although not a test for adequacy, are guides for evaluating " 'the state interest in a procedural rule against the circumstances of a particular case.' " *Id.* (quoting and citing *Lee*, 534 U.S. at 381–85, 122 S.Ct. 877). These three factors include

> (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had "substantially complied" with the rule given "the realities of trial," and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.

*Id.* (quoting *Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir.2003)).

 Because a general non-specific objection fails to alert the trial court to the exact legal nature of the defendant's position, it is insufficient to preserve the issue for further review. *Garvey*, 485 F.3d at 714–15 ("New York's highest courts uniformly instruct that to preserve a particular issue for appeal, defendant must specifically focus on the alleged error."). Further, New York Crim. Proc. Law

§ 470.05(2) (McKinney's 1994), provides that, "[f]or purposes of appeal, a question of law with respect to a ruling or instruction of a criminal court during trial or proceeding is presented when a protest thereto was registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same."

 Generally, no federal habeas review is available for any claim that has been procedurally defaulted in state court as, before a federal court may review a state prisoner's habeas petition, the prisoner must exhaust all available state court remedies. 28 U.S.C. § 2254(b)(1)(A); *see Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971) (citing cases). "The exhaustion requirement is not satisfied unless the federal claim has been 'fairly presented' to the state courts." *Rosa v. McCray*, 396 F.3d 210, 217 (2d Cir.), *cert. denied*, 546 U.S. 889, 126 S.Ct. 215, 163 L.Ed.2d 201 (2005). "A petitioner satisfies the fair presentation aspect of the exhaustion requirement by presenting the essential factual and legal premises of his federal constitutional claim to the highest state court capable of reviewing it." *Cotto v. Herbert*, 331 F.3d 217, 237 (2d Cir.2003) (citing *Ramirez v. Attorney Gen. of N.Y.*, 280 F.3d 87, 94 (2d Cir.2001)). The Second Circuit has recognized that " 'a state defendant may fairly present to the state courts the constitutional nature of his claim, even without citing chapter and verse of the Constitution' so long as he relies 'on pertinent federal cases employing [the relevant] constitutional analysis' or alleges 'a pattern of facts' that clearly implicates a specific constitutional provision." *Cotto*, 331 F.3d at 237 (quoting *Daye v. Attorney Gen.*, 696 F.2d 186, 191 (2d Cir.1982)).

Based on the record, the court finds that Petitioner fairly presented some of his present claims to the Court of Appeals for purposes of satisfying the exhaustion requirement, including his 1st, 2nd, 3rd, 4th, 5th, part of the 6th, 7th, 9th, 10th, 12th, 13th, 14th, 15th, 17th, 18th, 19th and 20th claims for relief, but not part of his 6th, or his 8th, 11th, and 16th claims for relief. *Morgan v. Bennett*, 204 F.3d 360, 370 (2d Cir.2000) (asking court to "consider and review all issues outlined in defendant-appellant's brief and *pro se* supplemental brief" was sufficient to alert the Court of Appeals that review was being sought on all claims raised in *pro se* brief); *see Davis v. Strack*, 270 F.3d 111, 122 (2d Cir.2001) (same); *cf. Jordan v. Lefevre*, 206 F.3d 196, 198–99 (2d Cir.2000) (arguing one claim in letter seeking leave to appeal to Court of Appeals while attaching appellate division briefs, without explicitly alerting Court of Appeals to each claim raised, does not fairly present such claims to state's highest court for purposes of habeas exhaustion requirement). The claims presented to the Court of Appeals are considered exhausted and there is no procedural bar precluding federal habeas review of the merits of the exhausted claims. *See Coleman*, 501 U.S. at 750, 111 S.Ct. 2546. As this matter is before the undersigned for a report and recommendation, however, the court considers the merits of the unexhausted claims in the event the district judge disagrees with the initial recommendation that such claims are unexhausted.

### 4. Merits of Claims

As stated, Petitioner has asserted 20 grounds for habeas relief challenging his conviction and sentence as unconstitutional based on (1) unlawful arrest, Petition ¶ 12(A); (2) impermissibly suggestive identification procedures, Petition ¶ 12(B); (3) denial of right to conflict-free counsel, Petition ¶ 12(C); (4) an improperly impan-

eled trial jury, Petition ¶ 12(D); (5) use of inadmissible tape recordings and transcripts, Petition ¶ 12(E); (6) improper use of voice identification testimony, Petition ¶ 12(F); (7) introduction of impermissible DNA evidence at trial, Petition ¶ 12(G); (8) prosecutorial misconduct, Petition ¶ 12(H); (9) use of an "annotated" verdict sheet, Petition ¶ 12(I); (10) trial court judge's failure to recuse himself after the case was remanded for a reconstruction hearing regarding use of the annotated verdict sheet, Petition ¶ 12(J); (11) conflict of interest between the trial court judge and the prosecutor, Petition ¶ 12(K); (12) withholding of exculpatory evidence by the prosecutor, Petition ¶ 12(L); (13) ineffective assistance of appellate counsel, Petition ¶ 12(M); (14) the appellate court's failure to consider all supporting papers when ruling on Petitioner's motion for a writ of error *coram nobis*, Petition ¶ 12(N); (15) the jury's consideration of improper evidence during deliberations, Petition ¶ 12(O); (16) inadmissible fingerprint evidence, Petition ¶ 12(P); (17) failure to preserve evidence, Petition ¶ 12(Q); (18) insufficient evidence to support the verdict, Petition ¶ 12(R); (19) the imposition of consecutive sentences, resulting in an excessive sentence, Petition ¶ 12(S); and (20) ineffective assistance of trial counsel, Petition ¶ 12(T). The court addresses the merits of each ground in turn.

### A. Unlawful Arrest

Petitioner asserts that his arrest on was not based on probable cause and, thus, was unlawful. Petition ¶ 12(A). According to Petitioner, the stop of Christopher Knight's vehicle, in which Petitioner was a passenger, on May 13, 1994, under the stated suspicion that the vehicle was stolen, was mere pretext to effect Petitioner's warrantless arrest and subsequent interrogation without probable cause. *Id.* Peti-

tioner particularly maintains that despite the prosecution's claims that Petitioner was arrested based on statements made by McGriff and French, neither McGriff nor French testified before the Grand Jury, and both McGriff and French had contacted WHEC–TV, a local television news station, which arranged for McGriff and French to be interviewed by the station's news reporter Janet Lomax ("Lomax"). During the interview on May 20, 1994, both McGriff and French denied that Petitioner was involved with the crime, stating that they had been coerced by detectives into signing the earlier statements inculpating Petitioner. Memorandum at 3. Although Jacobs, Petitioner's assigned attorney, spoke with both McGriff and French prior to the suppression hearing, neither was called to testify at the hearing. *Id.* at 5. At the start of the suppression hearing, Jacobs failed to inform the court of the alleged conflict of interest, *i.e.*, that other public defenders from Jacobs's office, including the supervising attorney, were member of the same neighborhood anti-crime program of which the victim's father was the chair, and when Petitioner mentioned the supposed conflict and requested an adjournment, Justice Affronti denied the request. *Id.* at 5–6. Respondent argues in opposition that because Petitioner already received a full and fair opportunity to litigate Petitioner's claim of an unconstitutional arrest in state court, this court is precluded from considering the claim. Response at 2.

■ It is settled that Fourth Amendment claims on unconstitutional search and seizure are not subject to federal habeas review "where the state has provided an opportunity for full and fair litigation of

[the] claim." *Stone v. Powell*, 428 U.S. 465, 494, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). In reaching that conclusion, the Supreme Court noted that "in the case of a typical Fourth Amendment claim, asserted on collateral attack, a convicted defendant is usually asking society to redetermine an issue that has no bearing on the basic justice of his incarceration." *Stone*, 428 U.S. at 491 n. 31, 96 S.Ct. 3037. Further, a finding that a claim is precluded from federal habeas review under *Stone*, is a "permanent and incurable" bar, representing final federal adjudication on the merits of the claim. *Graham v. Costello*, 299 F.3d 129, 134 (2d Cir.2002). *Accord Villanueva v. United States*, 346 F.3d 55, 60–61 (2d Cir.2003).

■ The record in the instant case establishes that the trial court conducted a five-day pretrial hearing at which the constitutionality of Petitioner's seizure and arrest, including probable cause to sustain the arrest, was discussed pursuant to *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979),[14] *People v. Huntley*, 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965), and *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). Suppression Tr. 1, Tr. 2 and Tr. 3, SR Vol. 1. Petitioner attended the hearing and presented witnesses on his behalf. Suppression Tr. 2 at 57–84, and Tr. 3 at 3–7, SR Vol. 1. Following the suppression hearing, Justice Affronti issued a lengthy decision finding probable cause existed for Petitioner's warrantless arrest on May 13, 1994 and, therefore, no violation of *Dunaway, supra.* December 22, 1994 Decision and Order, Vol. I, Response Exh. D at 13–125, 30–35.

---

14. That the merits of a defendant's unlawful seizure were reached in *Dunaway*, 442 U.S. 200, 99 S.Ct. 2248, despite a prior state court suppression hearing on the issue which, pursuant to *Stone*, 428 U.S. at 494, 96 S.Ct. 3037, forecloses the issue, is explained by the difference between the scope of review available on direct appeal to the Supreme Court (*Dunaway*), and in a federal habeas proceeding and subsequent appeals (*Stone*).

It thus cannot be disputed that Petitioner had a "full and fair" opportunity to litigate whether his seizure and arrest occurred within the confines of the Fourth Amendment.

As such, this ground of the Petition is without merit.

### B. Suggestive Identification Procedures

Petitioner maintains the procedures by which he was identified by eyewitnesses Michael Smith and Robert Geer were impermissibly suggestive identification procedures. Petition ¶ 12(B). Specifically, Petitioner asserts that on May 13, 1994, after being arrested and taken to the Rochester Police Department for interrogation, the Rochester Police conducted a press conference, following which Petitioner was escorted out of the building en route to the Monroe County Sheriff's Office building to be booked on the charges. *Id.;* Memorandum at 8–9. The walk was captured on film by media members, and Petitioner's image was broadcast on local news channels and also appeared in the local papers both on May 13, 1994 and for several days thereafter. *Id.* According to Petitioner, because the photo array displayed to Michael Smith and Robert Geer was compiled after intense news coverage of Petitioner's arrest, the identifications by both Michael Smith and Robert Geer were tainted. Petitioner ¶ 12(B); Memorandum at 9–10. Petitioner further maintains that the photo array was impermissibly suggestive, independent of the media coverage insofar as the photograph of Petitioner in the array depicts Petitioner with a large gold earring in his left ear, which was also seen on the media broadcasts of Petitioner, a larger head than the other individuals, more facial hair, and that a shadow on the photograph "makes petitioner appear to have nappy hair, which had previously been de-scribed by Michael Smith." Petition ¶ 12(B); Memorandum at 10–13. Respondent asserts in opposition that despite Petitioner's contention, the pre-trial identification process was not so suggestive as to deprive Petitioner of due process. Response at 3–5.

*Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), established a two-part test to be used in assessing the reliability of identification procedures used in criminal cases. First, the court must determine whether the identification procedures used by the police were unnecessarily suggestive. *Manson,* 432 U.S. at 110–12, 97 S.Ct. 2243. Second, even if the procedure was suggestive, the court must decide, after reviewing the totality of the circumstances, if the in-court identification was independently reliable. *Id.* Otherwise, if the procedures were not impermissible suggestive, then independent reliability is not a constitutionally required condition of admissibility. *Jarrett v. Headley,* 802 F.2d 34, 42 (2d Cir.1986) (citing cases).

Generally, "a pretrial photographic identification procedure used by law enforcement officials violates due process if the procedure 'is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Jarrett,* 802 F.2d at 41 (quoting *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)). Provided the number of photographs shown is not so small as to make the presentation itself unfairly suggestive, and there is nothing suggestive about the law enforcement officer's manner of presentation, "the principal question is whether the picture of the accused, matching descriptions given by the witness, so stood out from all of the other photographs as to suggest to an identifying witness that [that person] was more likely to be the culprit."

*Jarrett,* 802 F.2d at 41 (citing cases). It is not required that all of the photographs in the array be uniform as to a given characteristic. *Id.* The record in the instant case establishes that the photographic array was not impermissible suggestive.

First, the photo array was comprised of six photographs, a number which has been held not impermissibly suggestive. *United States v. Archibald,* 734 F.2d 938, 940 (2d Cir.1984); *United States v. Bennett,* 409 F.2d 888, 898 (2d Cir.), *cert. denied,* 396 U.S. 852, 90 S.Ct. 113, 24 L.Ed.2d 101 (1969). All six photos depicted black males of similar age and medium complexion. Suppression Tr. 2 at 284, SR Vol. I. Insofar as Petitioner maintains that the intense media coverage, including that pictures of Petitioner were shown on both local television news broadcasts and in the Democrat and Chronicle, a local newspaper of general circulation, in the images of Petitioner that appeared on local television and in the newspaper, Petitioner was wearing a hat and eyeglasses, whereas the photo of Petitioner included in the photo array does not depict Petitioner wearing either a hat or glasses. *Id.* Upon being shown the photo array, Robert Geer stated that although he had heard that someone had been arrested in connection with the crime, he had not seen any television news reports and, hence, was unaware of any accompanying pictures, *id.,* and thus would have been unaware that Petitioner was wearing an earring upon his arrest on May 13, 1994. That Geer did not recall Petitioner as having any facial hair on November 13, 1993, yet selected Petitioner's photo, depicting Petitioner with facial hair, from the photo array, *id.* at 283, further undermines Petitioner's argument that the photo array was impermissible suggestive.

Because Petitioner fails to point to any evidence in the record supporting his assertion that the photo array was impermissibly suggestive, the court need not consider whether any subsequent identification of Petitioner was independently reliable. Therefore, there is no merit to this ground for relief.

## C. Right to Conflict-free Counsel

Petitioner alleged that he was denied his Sixth Amendment right to counsel when the trial court declined to discharge Petitioner's assigned defense counsel based on an alleged conflict of interest, *i.e.,* that members of the same Public Defender's Office as Mr. Jacobs belonged to the neighborhood crime prevention program chaired by victim's father. Petition ¶ 12(C); Memorandum at 17. Respondent maintains there is no merit to an alleged attorney conflict of interest absent some evidence of an actual conflict. Response at 7–8.

Where a Sixth Amendment right to counsel exists, "there is a correlative right to representation that is free from conflicts of interest." *Wood v. Georgia,* 450 U.S. 261, 271, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981). To establish a violation of this right, a habeas petitioner must "demonstrate [ ] that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Strickland v. Washington,* 466 U.S. 668, 692, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (quoting *Cuyler v. Sullivan,* 446 U.S. 335, 350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)). If such showing is made, prejudice is presumed. *Id.*

Here, Petitioner has failed to make the requisite showing. Rather, Petitioner merely speculates that, based on the participation of another attorney member of the public defender office by which Jacobs was employed in a neighborhood crime prevention program allegedly headed by the victim's father, Jacobs labored

under a conflict of interest. Nor does Petitioner point to anything to support that Jacobs was even aware of the other attorney's involvement in the program. However, even if Petitioner's assertion is correct in that another public defender from Jacobs's office did participate in a neighborhood crime watch program headed by the victim's father, facts which are not substantiated by the record, although not denied by Respondent, such facts in no way support a conclusion that Jacobs "actively represented conflicting interests." *Strickland,* 466 U.S. at 692, 104 S.Ct. 2052. Even if the other public defender attorney did engage in such extra-judicial community activity, Petitioner is unable to show such involvement constituted legal representation such that a more colorable basis for asserting a conflict may exist.

Accordingly, this ground of the Petition is without merit.

### D. Refusal to Dismiss Prospective Jurors before *Voir Dire*

According to Petitioner, the trial jury which convicted Petitioner on all three counts under both Indictments was improperly impaneled given that during jury selection, a substantial number of the prospective jurors indicated they had already formed an opinion regarding the case pending against Petitioner. Petition ¶ 12(D); Memorandum at 20–21. Respondent argues in opposition that Petitioner has failed to establish that the empaneled jury that rendered Petitioner's conviction was not impartial, as required to succeed on this ground. Response at 8–9.

■ Federal due process does not require the summary dismissal of all prospective jurors who admitted having an opinion regarding the defendant's guilt; rather, in challenging a criminal conviction as rendered by an impartial jury, the burden is on the Petitioner to establish that the jury, as empaneled, was not impartial. *See United States v. Rubin,* 37 F.3d 49, 54 (2d Cir.1994) (holding district court did not err in failing to excuse certain potential jurors for cause based on answers given in *voir dire,* thereby forcing defense counsel to use peremptory challenges, because each disputed jury gave full and frank answers to questions, assuring his or her impartiality in deciding the defendant's case, and the defendant failed to make requisite showing that jury eventually impaneled was not impartial). *See also United States v. Towne,* 870 F.2d 880, 885 (2d Cir.) (trial court's failure to excuse potential juror, who admitted having formed an opinion as to defendant's guilt, did not deprive the defendant of right to fair and impartial jury absent showing that jury ultimately selected was unfair or impartial), *cert. denied,* 490 U.S. 1101, 109 S.Ct. 2456, 104 L.Ed.2d 1010 (1989).

■ Similarly, here, Petitioner has also failed to make any showing that the jury eventually impaneled, which convicted Petitioner on all three criminal counts, was not impartial. Significantly, Petitioner does not even state whether any of the prospective jurors who allegedly indicated, in written responses to the jury questionnaire completed prior to *voir dire,* they believed that Petitioner was guilty of the charged crimes, were ever selected and impaneled as jurors. Thus, Petitioner's claim on this ground is without a factual foundation in the record.

Accordingly, this ground for habeas relief is meritless.

### E. Audiotape Evidentiary Error

Petitioner asserts that during the trial, the court permitted an audiotape of a 911 emergency cell phone call to be admitted into evidence without a proper foundation establishing the audiotape's authenticity,

as required under both state and federal law. Petitioner ¶ 12(E); Memorandum at 25–30. Respondent maintains the 911 emergency call audiotape's authenticity is a matter of state evidentiary law, and not subject to federal habeas review. Response at 10–11.

■ First, as discussed, Discussion, *supra,* at 273, evidentiary rulings by state trial and appellate courts are presumed to be correct unless the federal habeas court concludes that the relevant state court determination is not fairly supported by the record. *Sumner,* 449 U.S. at 546–47, 101 S.Ct. 764. For a federal habeas petitioner to prevail on a claim that an evidentiary error amounted to a deprivation of due process, he must show that the error was so persuasive as to have deprived him of a fundamentally fair trial. *United States v. Agurs,* 427 U.S. 97, 108, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The standard is "whether the erroneously admitted evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it. In short, it must have been 'crucial, critical, highly significant.'" *Collins v. Scully,* 755 F.2d 16, 19 (2d Cir.1985) (quoting *Nettles v. Wainwright,* 677 F.2d 410, 414–15 (5th Cir.1982)). Here, Petitioner has failed to satisfy this heavy burden.

■ Specifically, even if the 911 cell phone call audiotape were erroneously admitted into evidence without having been sufficiently authenticated, such evidence was merely cumulative of other evidence placing Petitioner inside the victim's vehicle at the time of her murder. *Compare* Tr. 2196–2204 (Damian Smith testifying that McGriff reported Petitioner admitted killing the victim, and identifying Petitioner's and McGriff's voices on the 911 call audiotape) *with* Tr. at 2286–90, 2429 (Rochester Police Officer Robert Garland and Technician Scott Campbell testifying that Petitioner's fingerprint was found inside the victim's vehicle). Such other evidence includes photo array identification by two eyewitnesses, statements by McGriff and Damian Smith, who were present while Petitioner was driving the victim in her vehicle just prior to her death, and DNA evidence. Tr. at 1707–19, 2002–25. Accordingly, the disputed 911 audiotape alone neither provided the basis for conviction, nor was it sufficiently material as to remove any reasonable doubt as to Petitioner's guilt.

This ground for habeas relief is without merit.

## F. Voice Identification Testimony

According to Petitioner, Damian Smith's testimony identifying Petitioner's voice on the audiotape was improperly admitted into testimony. Petition ¶ 12(F); Memorandum at 31–35. Petitioner specifically objects to the fact that the prosecutor failed to notify Petitioner pursuant to N.Y.Crim. Proc. Law § 710.30 (McKinney 1995) of the anticipated testimony of Damian Smith, and waited until the trial was well underway before surprising the court with the testimony of Damian Smith, who is not an expert witness on voice identification but, rather, merely a lay witness, and that the error in admitting the audiotape into evidence was further compounded by the introduction into evidence of a transcript of the 911 call. *Id.* Further, Petitioner maintains that prior to listening to the audiotape of the 911 call at the police station, Damian Smith was informed about a reward available for information leading to the perpetrator's arrest, that one Katrina Williams testified before the Grand Jury that Damian Smith was the driver of the victim's vehicle, and that the Federal

Bureau of Investigation ("FBI") issued a report stating that, upon examining and comparing the 911 emergency call audiotape to voice exemplars submitted by Petitioner, Damian Smith and McGriff, the poor quality of the audiotape rendered the FBI unable to determine the number of speakers on the audiotape or to conduct spectrographic analysis, such that it was not possible to determine whether Petitioner's voice was heard on the tape. Memorandum at 34–35.

In opposition, Respondent argues that the this claim is preserved for review only as to Petitioner's assertions of an insufficient foundation for Damian Smith's testimony that Petitioner's voice could be heard on the 911 call audiotape, that the FBI, upon analyzing the tape, determined it was not amenable to voice spectography analysis, and that the poor quality of the audiotape precluded any reliable voice identification based on such evidence. Response at 11–12. According to Respondent, insofar as the claim was preserved for review, it raises a state evidentiary challenge not cognizable in federal habeas review. *Id.* at 12. Otherwise, the claim was not preserved for review and Petitioner is now procedurally barred from raising it. *Id.*

On direct appeal, the Appellate Division found Petitioner failed to preserve for appeal his contentions that the 911 call audiotape was inaudible and that the trial court erred when, in the absence of notice under N.Y.Crim. Proc. Law § 710.30 ("§ 710.30 notice"), it received testimony concerning the identification of Petitioner's voice on the 911 call audiotape. *People v. Knight*, 280 A.D.2d 937, 721 N.Y.S.2d 166, 170 (App.Div. 4th Dep't.2001). The record, however, establishes that Petitioner did specifically object to the testimony of Damian Smith on these grounds. *See* Tr. at 2164–71 (establishing that Petitioner ob-

jected to Damian Smith's testifying as to voice identification of the 911 call audiotape), and Tr. at 2193–95 (establishing that Petitioner objected to the length of the audiotape as insufficient to permit analysis by the FBI). As such, the court considers the contention regarding Damian Smith's testimony exhausted, but not the contention regarding the audiotape's audibility to which defense counsel raised only a general objection regarding the length of the tape, rather than the tape's audibility. Tr. at 1492–94.

■■■ Significantly, because a general objection fails to alert the court to the defendant's position, it is insufficient to preserve the issue for further review. *See Garvey v. Duncan*, 485 F.3d 709, 714–15 (2d Cir.2007) ("New York's highest courts uniformly instruct that to preserve a particular issue for appeal, defendant must specifically focus on the alleged error."). Petitioner is thus procedurally barred from seeking habeas review of his audibility contention relating to the admissibility of the 911 call tape.

■■■ As to Petitioner's remaining contentions, state court determinations regarding evidentiary matters are presumed to be correct unless the federal habeas court concludes that the relevant state court determination is not fairly supported by the record. *Sumner v. Mata*, 449 U.S. 539, 546–47, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981) (observing that Congress recognized federalism interest in enacting habeas law requiring "deference by federal courts to factual determinations of all state courts."); *LanFranco v. Murray*, 313 F.3d 112, 117 (2d Cir.2002) ("In reviewing habeas petitions, we must presume the state court's findings of fact are correct, unless the petitioner meets the 'burden of rebutting th[is] presumption of correctness by clear and convincing evidence.'") (quoting 28 U.S.C. § 2254(e)(1), and citing *Brown v.*

*Artuz,* 283 F.3d 492, 498 (2d Cir.2002)). The burden rests on a petitioner to establish, by clear and convincing evidence, that the factual determination is erroneous. 28 U.S.C. § 2254(e)(1). If, however, the state court has not adjudicated the claim "on the merits," then § 2254's presumption of correctness does not apply, and the pre-AEDPA standard of review, *i.e.,* reviewing *de novo* both questions of law, and mixed questions of law and fact, applies.[15] *Artuz,* 283 F.3d at 498 (citing *Washington v. Schriver,* 255 F.3d 45, 55 (2d Cir.2001)).

■ Here, the Appellate Division specifically found, on the merits, that the 911 call audiotape was properly authenticated by the 911 operator, that the employee who made the audiotape verified its authenticity, and that the use of the transcripts of the 911 call audiotape to aid the jury was not an abuse of discretion. *Knight I,* 721 N.Y.S.2d at 169. Petitioner asserts no basis for rebutting the presumption of correctness as applicable under § 2254(e)(2), and such findings are thus entitled to § 2254(e)(1)'s presumption of correctness.

Accordingly, this ground for relief is without merit.

### G. DNA Expert's Testimony

Petitioner alleges the trial court erred in refusing to strike the testimony of the prosecution's DNA experts from Cellmark Diagnostics. Petitioner ¶ 12(G); Memorandum at 35–43. Essentially, Petitioner maintains some of the laboratory procedures and methodology Cellmark employed were not generally accepted by the scientific community. *Id.* In opposition, Respondent argues that this claim presents a state evidentiary issue not cogniza-

ble for federal habeas review, and that the Appellate Division rejected this claim on the merits. Response at 13–17.

■ As discussed, provided the state court's findings are on the merits, such findings are, upon federal habeas review, entitled to § 2254(e)'s presumption of correctness unless the petitioner establishes by, clear and convincing evidence, that the factual determination is erroneous. *LanFranco,* 313 F.3d at 117. In the instant case, the Appellate Division thoroughly considered and rejected, on the merits, the claims challenging the DNA evidence Petitioner presents here. *See People v. Knight,* 280 A.D.2d 937, 721 N.Y.S.2d at 168–69 (App.Div. 4th Dep't.2001). In particular, the Appellate Division rejected on the merits contentions that Cellmark's laboratory procedures and protocol for performing DNA analysis were unreliable, that Cellmark's databases were insufficiently random and representative as to be generally accepted as reliable by the scientific community, and that an adequate foundation was established at trial that the laboratory employed accepted techniques. *Id.* The Appellate Division further held that the challenges to the population studies upon which Cellmark relied to estimate the probability of a coincidental DNA match to Petitioner was relevant not to the admissibility of such evidence but, rather, to the weight to be afforded such evidence by the trier of fact. *Id.* Significantly, Petitioner has failed to present any reasons, much less clear and convincing evidence, establishing that the Appellate Division's factual determinations on this claim are erroneous.

This ground for relief is, accordingly, baseless.

---

**15.** The AEDPA standards for reviewing state court findings and conclusions apply to any petitioner filed, as Petitioner's was, after April 24, 1996, the AEDPA's effective date. *Williams,* 529 U.S. at 402, 120 S.Ct. 1495.

## H. Prosecutorial Misconduct

Petitioner claims prosecutorial misconduct with regard to the questioning of two witnesses, Reginald McGriff and Damian Smith, and during the prosecutor's summation during which the assistant district attorney expressed damaging incriminating hearsay testimony and shifted the burden of proof to Petitioner. Petition ¶ 12(H); Memorandum at 43–47. Specifically, Petitioner contends that the prosecutor impermissibly questioned Petitioner's common-law wife, Cathy Watson, about the fact that McGriff was seated next to Watson in the courtroom, insinuating that Watson and McGriff knew each other and that such questioning of Watson was intended to conceal the fact that the prosecution failed to call McGriff as a witness, thereby depriving defense counsel of the opportunity to cross-examine McGriff. Petition at 12–13. Petitioner also contends that the prosecutor used leading questions in eliciting testimony from Damian Smith, a witness for the prosecution, who testified Petitioner admitted to him having killed the victim. *Id.* at 13. Despite an objection from defense counsel to the leading questions, which was sustained by the court, the prosecutor, on re-direct examination of Smith, referred to Smith's testimony that Petitioner had admitted having killed the victim. *Id.* Petitioner further asserts that the prosecutor, during re-direct examination of Smith, elicited incriminating hearsay statements to the effect that McGriff told Smith that Petitioner had admitted killing the victim, an issue not raised by defense counsel Jacobs during his cross-examination. *Id.* at 14–15. Defense counsel's objection to this testimony as hearsay and in violation of Petitioner's right to confrontation and cross-examination given that McGriff was not called to testify was sustained by the court. *Id.* at 15 (referencing Tr. at 2235–36). Finally, Petitioner maintains that the prosecutor, during summation, shifted the burden of proof to Petitioner by stating that throughout the four week trial, no evidence was presented as to what Petitioner looked like on November 13, 1993, compared to what Petitioner looked like when he was identified prior to the arrest some six months later, by prosecution witness Michael Smith, as the perpetrator of the charged crimes. *Id.* at 15. Justice Affronti overruled defense counsel's objection to the prosecutor's statement. *Id.* at 15–16.

In opposition, Respondent asserts that no objection was made during trial to many of the statements underlying this claim and, to that extent, the claim is not preserved for habeas review. Response at 17–20. As to the prosecutor's examination of Damian Smith regarding statements Reginald McGriff reportedly made to Damian Smith about the murder, Respondent maintains that defense counsel "opened the door" to such line of questioning during cross-examination of Damian Smith. *Id.* at 19. As such, the prosecutor's reference to such statement during summation was a proper comment on the evidence. *Id.* at 20. Alternatively, Respondent maintains that even improper statements made by the prosecutor during summation generally do not violate a defendant's federal constitutional rights to due process. *Id.* at 20–21.

 The test for an alleged denial of due process based upon prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. *Smith v. Phillips,* 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor"). To deny a habeas petitioner due process based on prosecutorial statements,

the statements have to have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 182, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); *Floyd v. Meachum*, 907 F.2d 347, 353 (2d Cir.1990). "In evaluating whether allegedly improper comments by the prosecutor are grounds for reversal, the fundamental question is whether, if there was misconduct, it caused substantial prejudice to the defendant, thereby depriving him of his right to a fair trial." *United States v. LaMorte*, 950 F.2d 80, 83 (2d Cir.1991) (citing *United States v. Biasucci*, 786 F.2d 504, 514 (2d Cir.), *cert. denied*, 479 U.S. 827, 107 S.Ct. 104, 93 L.Ed.2d 54 (1986)). In determining the degree of prejudice to a petitioner, the factors to consider are the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction based on the evidence absent the misconduct. *United States v. Young*, 470 U.S. 1, 12–14, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); *La Morte*, 950 F.2d at 83; *United States v. Modica*, 663 F.2d 1173, 1181 (2d Cir.1981).

Thus, no matter how improper the prosecutor's comments were, the only concern of the court in reviewing a claim of prosecutorial misconduct on a federal habeas petition is the fundamental fairness of the trial. *Donnelly v. DeChristoforo*, 416 U.S. 637, 645, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Further, statements made by prosecutors in their summation, even if seemingly improper, do not necessarily exceed "the broad range of rhetorical comments allowed in closing arguments." *Harper v. Kelly*, 704 F.Supp. 375, 379 (S.D.N.Y.1989), *rev'd on other grounds*, 916 F.2d 54 (1990). *See also Donnelly*, 416 U.S. at 646–47, 94 S.Ct. 1868 (isolated passages of a prosecutor's argument, even if imperfect, do not suggest that a jury will be so profoundly affected so as to affect the fundamental fairness of a trial).

■■■■ On this record, none of the alleged incidents of prosecutorial misconduct provides grounds for habeas relief. In particular, defense counsel voiced a general objection to the line of questioning regarding Ms. Watson's relationship with Reginald McGriff, which was sustained but with no curative instruction being sought by defense counsel. Tr. at 2583–84. As such, the claim is not preserved for habeas review. *Garvey*, 485 F.3d at 714–15 (holding that because a general objection fails to alert the court to the defendant's position, it is insufficient to preserve the issue for further review under § 2254). Similarly, defense counsel failed to object to the prosecutor's leading questions to Damian Smith eliciting from Damian Smith that Petitioner told Damian Smith that Petitioner killed the victim. Tr. at 2228. As such, this claim is also not preserved for review. *Garvey*, 485 F.3d at 714–15.

■■■ As to Petitioner's assertion that the prosecutor improperly elicited on direct examination hearsay testimony from Damian Smith regarding Reginald McGriff's statement that Petitioner had killed the victim, Justice Affronti ruled in response to defense counsel's objection that defense counsel had opened the door to such questioning by asking Smith, on cross-examination, whether Smith ever spoke with Reginald McGriff about the slaying, Tr. at 2229–30, and the record establishes that defense counsel did indeed question Smith about conversations with Reginald McGriff regarding the murder. Tr. at 2229–30, 2235–41. It follows that because the prosecutor merely elicited from Smith on redirect examination that McGriff stated Petitioner had admitted he was the victim's killer, the prosecutor did not commit any misconduct in referencing such testimony during summation. There

is thus no merit to this portion of Petitioner's prosecutorial misconduct claim.

■ Nor is there any merit to Petitioner's assertion that prosecutorial misconduct amounting to a denial of due process occurred when the prosecutor, during summation, attempted to shift the burden of proof to Petitioner by commenting that no evidence had been presented regarding what Petitioner looked like on November 13, 1993, as compared to when Petitioner was identified by Michael Smith in April 1994. Rather, the record establishes that Justice Affronti overruled defense counsel's objection because the statement was a "[f]air comment on the evidence." Tr. at 2696. A plain reading of the record establishes that the such statement was broad rhetoric regarding the overall proof at trial which did not so profoundly affect the jury as to render the entire trial fundamentally unfair particularly in light of other persuasive evidence demonstrating Petitioner's guilt. Tr. at 2696. Furthermore, defense counsel had previously commented on the dissimilarities between Petitioner's appearance in court during trial, and the description of the killer given by Michael Smith and Robert Geer at trial. Tr. at 2616. In other words, the prosecutor's statements Petitioner challenges as misconduct were uttered to rebut defense counsel's arguments. This issue was therefor fair game for the prosecutor's rebuttal efforts. *See Okehoffurum v. Kean*, 1996 WL 1086073, * 5 (E.D.N.Y. July 2, 1996) (finding no merit to argument asserted in support of habeas petition that prosecutor's comments during closing arguments amounted to prosecutorial misconduct where challenged comments merely rebutted defense counsel's closing argument).

There is thus no basis for habeas relief based on any prosecutorial misconduct during summation, and this ground as alleged in the Petition is also without merit.

### I. Annotated Verdict Sheet

Petitioner argues his conviction was obtained through use of an annotated verdict sheet. Petition ¶ 12(I). According to Petitioner, under New York law, the use of a verdict sheet that contains language describing elements of the charged crimes for use in jury deliberations, is reversible error *"per se,"* requiring retrial, and such error was not cured by the Appellate Division's remanding the matter for a reconstruction hearing to determine whether defense counsel Jacobs consented to the use of such verdict sheet. *Id.;* Memorandum at 47–51. Respondent argues in opposition that the reconstruction hearing upon remand established defense counsel's consent to the subject verdict sheet, such that its use did not result in any error that was reversible *per se.* Response at 21–24.

Under New York law, "it is error to submit verdict sheets that, in addition to listing the charged crimes and the possible verdicts, also list some or all of the crimes' statutory elements." *People v. Taylor,* 76 N.Y.2d 873, 560 N.Y.S.2d 982, 983, 561 N.E.2d 882, 883 (1990) (citing N.Y.Crim. Proc. Law § 310.30 and *People v. Nimmons,* 72 N.Y.2d 830, 530 N.Y.S.2d 543, 526 N.E.2d 33 (1988)). Such "annotated" verdict sheets are generally prohibited because of a perceived risk that they may unfairly skew the jury's deliberative process. *Taylor,* 560 N.Y.S.2d at 983, 561 N.E.2d at 883. In fact, "it is *per se* reversible error to give a jury a verdict sheet that contains anything other than what is permitted by C.P.L. § 310.20(2) without the express consent of defense counsel." *Anderson v. Keane,* 283 F.Supp.2d 936, 943 (S.D.N.Y.2003). Further, although N.Y.Crim. Proc. Law § 310.30 (McKinney 2002) also provides that the jury may be provided with a verdict sheet which lists the elements of the crimes charged if the

parties consent, *Taylor*, 560 N.Y.S.2d at 983, 561 N.E.2d at 883 (citing § 310.30), "the lack of an objection to the annotated verdict sheet by defense counsel cannot be transmuted into consent . . . ." *People v. Damiano*, 87 N.Y.2d 477, 640 N.Y.S.2d 451, 455, 663 N.E.2d 607, 611 (1996).

Nevertheless, as relevant here, even an error that is, under state law, *per se* reversible, provides no basis for federal habeas relief under § 2254 absent any constitutional counterpart in Supreme Court jurisprudence. *DelValle v. Armstrong*, 306 F.3d 1197, 1200 (2d Cir.2002) (holding *per se* reversible error under state law based on improper jury instructions did not entitle petitioner to habeas relief in the absence of any counterpart in Supreme Court caselaw, citing *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). Significantly, Petitioner has failed to point to, and the court's research has not revealed, any counterpart in Supreme Court constitutional jurisprudence providing for habeas relief based on the use of an annotated verdict sheet as Petitioner alleges in this case.

There is, accordingly, no merit to this ground for relief.

## J. Trial Judge's Failure to Recuse Himself upon Remand

Petitioner maintains that upon remand by the Appellate Division for a reconstruction hearing to determine whether Petitioner had consented to use of the annotated verdict sheet at trial, Justice Affronti should have recused himself. Petition ¶ 12(J); Memorandum at 51–54. Respon-

dent maintains in opposition that Justice Affronti was not required to recuse himself from the reconstruction hearing in the absence of a direct, personal, substantial or pecuniary interest in reaching a particular conclusion, or where a clash in judicial roles exists, and neither such situation was present in the instant case. Response at 24.

Because, as discussed above, no counterpart in Supreme Court jurisprudence exists pertaining to the use of an annotated verdict sheet, it logically follows that issues relating to the conduct of the reconstruction hearing held upon remand to determine whether defense counsel consented to the use of such verdict sheet cannot provide any basis for federal habeas relief. Accordingly, this ground of the Petition lacks merit.

## K. Judicial Conflict of Interest

Petitioner asserts that Justice Affronti should have recused himself at Petitioner's trial based on a conflict of interest that arose when Justice Affronti's wife appeared in the courtroom in the company of the victim's family at both the trial and the reconstruction hearing. Petition ¶ 12(K); Memorandum at 55–58. Petitioner speculates that Justice Affronti's wife sat with the victim's family in the courtroom because there is some relationship between them, thereby creating an actual conflict of interest necessitating Justice Affronti's recusal pursuant to N.Y. Jud. Law § 14 and 28 U.S.C. § 455(a).[16] *Id.* Respondent asserts in opposition that this ground for habeas relief is procedurally barred because, although raised in Petitioner's Sec-

---

**16.** N.Y. Jud. Law § 14 provides that "[a] judge shall not sit as such in, or take any part in the decision of, an action, claim, matter, motion or proceeding to which he is a party, or in which he has been attorney or counsel, or in which he is interested, or if he is related by consanguinity or affinity to any party to the controversy within the sixth degree." Similarly, 28 U.S.C. § 455(a) provides that "[a]ny justice, judge or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."

ond § 440 motion, Petitioner failed to specify the statutory basis for such claim. Response at 25–26. Respondent further asserts that Petitioner has failed to provide any factual support for the alleged conflict of interest, including any assertion as to how Justice Affronti's failure to recuse himself resulted in any prejudice to Petitioner. Response at 26–28.

■ As Respondent argues, Petitioner articulates no facts supporting his speculation that the fact that Justice Affronti's wife appeared in the courtroom in the company of the victim's family, both at trial and, six years later, at the reconstruction hearing, establishes that either Justice Affronti or his wife were related, either by consanguinity or affinity, to the victim's family, such that Justice Affronti's failure to recuse himself constituted a conflict of interest in violation of either N.Y. Jud. Law § 14 or 28 U.S.C. § 455(a). Nor does Petitioner reference, and the court's research has not revealed, any Supreme Court case holding that a violation of either such statute raises a due process claim for which habeas review is available. *See Disqualification of judge who presided at trial or of juror as ground of habeas corpus,* 124 A.L.R. 1079 (1940) (observing that both federal and state "cases hold that a judge's disqualification does not affect his jurisdiction or authority to act, but rather is in the nature of an error or irregularity affecting the rights of an accused person, remedial otherwise than in habeas corpus proceedings."). Moreover, for a district court to grant "habeas relief on the basis of speculation with slight support, the proper delicate balance between the federal courts and the States is upset...." *Wood v. Bartholomew,* 516 U.S. 1, 8, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995) (reversing grant of habeas relief based on speculation that prosecutor's failure to disclose results of polygraph examination of

key prosecution witness may have adversely affected defense counsel's pretrial preparation).

This ground for habeas relief is therefore without merit.

## L. Withholding of Exculpatory Evidence

Petitioner alleges a denial of due process based on the prosecution's withholding of *Brady* evidence, specifically, a videotape recording of an interview given by Reginald McGriff and Damian Smith on a local Rochester television station, WHEC–TV, in which McGriff and Smith largely recanted earlier statements identifying Petitioner as the victim's murderer. Petition ¶ 12(L); Memorandum at 58–62. Petitioner also challenges defense counsel Jacobs's representation as ineffective because Jacobs withheld the videotape from both Petitioner and the jury. ¶ 12(L). Respondent asserts that such evidence did not constitute *Brady* evidence, and that, in any event, Respondent was not required to provide such evidence to Petitioner because Petitioner was aware of the interview. Response at 28–31.

"*Brady* evidence" refers to evidence favorable to the accused and which the prosecutor is required to turn over to the defense. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (holding "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."). The duty to disclose such evidence applies even in the absence of any request by the accused, and the duty encompasses both exculpatory and impeachment evidence. *Strickler v. Greene,* 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (citing cases).

A *Brady* violation is an established ground for habeas relief. *See Leka v. Portuondo,* 257 F.3d 89 (2d Cir.2001) (granting habeas relief based on *Brady* violation where prosecutor failed to disclose exculpatory information). Where, however, the defendant is aware of the exculpatory or impeachment material, the prosecutor is under no obligation to disclose such information. *United States v. Torres,* 719 F.2d 549, 555 (2d Cir.1983) ("Evidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." (internal citations omitted)).

In the instant case, it is undisputed that Petitioner was aware of the videotape's existence, having "observed the broadcasting [of the interview] on television from the monroe county jail (*sic*), on May 20, 1994." Petition ¶ 12(L), p. 21. Further, Petitioner admits having communicated with Jacobs, his trial attorney, about the interview. *Id.* As both Petitioner and defense counsel Jacobs were aware of the interview, the prosecutor was under no obligation to disclose such information. *Torres,* 719 F.2d at 555.

Insofar as Petitioner contends defense counsel Jacobs's failure to obtain a copy of the videotape to present to the jury deprived Petitioner of effective assistance of counsel, the record establishes that this claim was not raised on appeal. As such, it is unexhausted and has been procedurally defaulted. *Cotto,* 331 F.3d at 237.

This ground of the Petition should thus be DENIED.

## M. Ineffective Assistance of Appellate Counsel

According to Petitioner, his Sixth Amendment right to effective assistance of counsel was violated when his appellate counsel failed to present several meritorious arguments, including that trial counsel (1) should not have called Petitioner's common law wife, Cathy Watson, to present alibi testimony, thereby subjecting Watson to cross-examination by the prosecutor who used prior statements Watson provided to law enforcement officials during the investigation to impeach Watson's testimony, (2) failed to object to the prosecution's request for imposition of consecutive, rather than concurrent, sentences, and (3) failed to argue that the two murder counts had merged. Petition ¶ 12(M); Memorandum at 62–64. In opposition, Respondent argues that these claims were rejected by the Appellate Division as "totally without merit," and that Petitioner presents no basis for finding otherwise. Response at 31–34.

"[T]he right to effective assistance of counsel is not confined to trial, but extends also to the first appeal as of right." *Kimmelman v. Morrison,* 477 U.S. 365, 378 n. 2, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) (citing *Evitts v. Lucey,* 469 U.S. 387, 396–97, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985)). A claim for ineffective assistance of appellate counsel is evaluated upon the same standard as is a claim of ineffective assistance of trial counsel. *Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir.1994) (citing *Claudio v. Scully,* 982 F.2d 798, 803 (2d Cir.1992), *cert. denied,* 508 U.S. 912, 113 S.Ct. 2347, 124 L.Ed.2d 256 (1993)); *Abdurrahman v. Henderson,* 897 F.2d 71, 74 (2d Cir.1990). The validity of a habeas petitioner's ineffective assistance of counsel claim is demonstrated by satisfying both elements of the two-part test as stated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Mayo,* 13 F.3d at 533. Specifically, a petitioner must demonstrate that "(1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense." *Bunkley v. Meachum,*

68 F.3d 1518, 1521 (2d Cir.1995) (citing *Strickland,* 466 U.S. at 688, 694, 104 S.Ct. 2052). The *Strickland* test also applies where ineffective assistance is claimed based on an action by the court. *See Tyson v. Keane,* 159 F.3d 732, 736 (2d Cir.1998) (denying habeas relief where petitioner claimed Sixth Amendment right to counsel violated by court's refusal to appoint an expert), *cert. denied,* 526 U.S. 1027, 119 S.Ct. 1270, 143 L.Ed.2d 365 (1999). The sufficiency of counsel's conduct depends on whether, in the context of the case, it was objectively reasonable. *Strickland,* 466 U.S. at 689–91, 104 S.Ct. 2052.

■ There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052 (quoting *Michel v. Louisiana,* 350 U.S. 91, 100–101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). As there are "countless ways to provide effective assistance in any given case," consideration of an ineffective assistance of counsel claim requires viewing the reasonableness of the counsel's challenged conduct with respect to the facts of the case as of the time of the counsel's conduct. *Strickland,* 466 U.S. at 689–90, 104 S.Ct. 2052.

■ Appellate counsel's performance will not be found objectively unreasonable, however, merely because every nonfrivolous argument was not advanced. *Mayo,* 13 F.3d at 533. Instead, appellate counsel is expected to focus on key issues and "winnow[ ] out weaker arguments." *Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). Appellate counsel's performance may be found constitutionally inadequate upon a demonstration that significant and obvious issues were ignored while weaker arguments were pursued. *Mayo,* 13 F.3d at 533. Further, the degree of prejudice required by *Strickland* will be met upon a showing by a petitioner that absent appellate counsel's deficient representation, there is a reasonable probability that the outcome of an appeal to the state's highest court would have been different. *Id.* at 534 (citing *Claudio,* 982 F.2d at 803).

Many courts, including the Supreme Court, have interpreted *Strickland* as permitting alleged state court violations, ordinarily required to be raised on direct appeal to the state courts to be preserved for federal habeas review, to be admitted for such review through the "back door" in the context of a claimed denial of effective assistance of appellate counsel. *Kimmelman,* 477 U.S. at 378, 106 S.Ct. 2574 (permitting Fourth Amendment issue to be evaluated on habeas review as a Sixth Amendment claim based on appellate counsel's failure to appeal trial court's denial of motion to suppress); *Holman v. Page,* 95 F.3d 481, 482–83 (7th Cir.1996) (same); *Bunkley,* 68 F.3d at 1522 (reviewing in the form of an ineffective assistance of appellate counsel claim asserted in habeas petition allegation that appellate counsel failed to raise on direct appeal to the state court that jury was improperly instructed on how to apply state law circumstantial evidence rule); *Durrive v. United States,* 4 F.3d 548, 550 (7th Cir. 1993) (observing that in limited circumstances an alleged violation of Fed. R.Crim.P. 32 requiring defendant be provided with copy of presentence report may be subject to federal habeas review in the context of an ineffective assistance of counsel claim). *See also Chestaro v. United States,* 17 F.Supp.2d 242, 244 (S.D.N.Y. 1998) (denying habeas relief on the basis that the claim that defense counsel failed

to challenge elements listed in indictment was not raised on direct appeal and could not subsequently be admitted through the "back door" clothed as an ineffective assistance of counsel claim and the claim failed to meet *Strickland* requirements based of the novelty of issue). However, the same standard—denial of a fair trial—is applicable to a claimed denial of constitutional right to due process whether asserted as denial of effective assistance of trial or appellate counsel. *Bunkley*, 68 F.3d at 1523.

█ Moreover, the Supreme Court has held that a Sixth Amendment violation of effective assistance of counsel warrants habeas relief only where the violation pervades the entire criminal prosecution as to cast doubt on the fairness of the trial process. *Satterwhite v. Texas*, 486 U.S. 249, 256, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988) (citing cases including *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978) (conflict of interest in representation throughout entire proceeding); *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (total deprivation of counsel throughout entire proceeding); *White v. Maryland*, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963) (absence of counsel from arraignment proceeding affected entire trial because defenses not asserted were irretrievably lost); and *Hamilton v. Alabama*, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961) (same)). Accordingly, the Court declined to adopt an automatic reversal rule for Sixth Amendment violations unless the deprivation of right to counsel affected and contaminated the entire criminal proceedings. *Satterwhite*, 486 U.S. at 257, 108 S.Ct. 1792. Otherwise, such claimed violations are subject to harmless error analysis. *Id.* at 258, 108 S.Ct. 1792.

█ In the instant case, the court finds that Petitioner has failed to overcome the requisite "strong presumption," *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, that appellate counsel rendered adequate assistance of counsel despite arguing on direct appeal that trial counsel should not have called Watson to testify as an alibi witness given that the prosecutor was able to impeach such testimony with her prior inconsistent statements, by failing to object to the prosecution's request for imposition of consecutive, rather than concurrent, sentences, and by failing to argue that the two murder counts, felony and intentional, had merged. Petitioner's assertion that appellate counsel's assistance was ineffective insofar as counsel failed to argue that trial counsel never should have called Watson as an alibi witness given the ease with which Watson's testimony was subsequently impeached by use of prior statements made to law enforcement officials is wholly without merit. Petitioner fails to explain how the appellate counsel's presentation of any argument on appeal, or the failure to do so, with which Petitioner disagrees falls below the constitutional threshold for effective assistance of counsel so as to deprive Petitioner of due process. Nor does Petitioner argue that the presentation of such argument was without any strategic or tactical justification. *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir.1998) (courts should not "on a cold record should not second-guess such decisions unless there is no strategic or tactical justification for the course taken."). Further, based on the strength of the identification testimony presented by the eyewitnesses, Damian Smith, and the fingerprint and DNA evidence, it was essential for defense counsel to present any alibi witness who was available, and the risk of impeachment of that witness was outweighed by the need to provide any defense calculated to establish reasonable doubt.

As to Petitioner's assertions that his appellate counsel's representation was ineffective based on the failure to challenge on appeal the prosecution's request for imposition of consecutive, rather than concurrent, sentences, and that the two murder counts had merged, such claims are without any legal basis. Given that appellate counsel's performance will not be found objectively unreasonable based on a failure to advance every nonfrivolous argument, *Mayo*, 13 F.3d at 533, appellate counsel's failure to advance an argument that is absolutely without any legal merit also provides no basis for habeas relief.

■ In particular, it is settled that sentences imposed within the limits of a state statute cannot amount to cruel and unusual punishment in violation of the Eighth Amendment. *United States v. Dawson*, 400 F.2d 194, 200 (2d Cir.1968), *cert. denied*, 393 U.S. 1023, 89 S.Ct. 632, 21 L.Ed.2d 567 (1969). The Second Circuit has held *Dawson* is applicable to habeas corpus collateral attacks upon consecutive sentences. *United States ex rel. Annunziato v. Deegan*, 440 F.2d 304, 306 (2d Cir.1971) (imposition of consecutive sentences did not constitute cruel and unusual punishment entitling petitioner to habeas relief where petitioner failed to challenge constitutionality of statutes under which he was convicted and sentenced). Because Petitioner does not challenge the constitutionality of the statutes under which he was convicted and sentenced, there is no basis for finding that the consecutive sentences imposed with regard to the separate convictions violated federal due process requirements, such that the failure to argue as much on appeal was ineffective assistance of appellate counsel. *Id.*

■ As for Petitioner's assertion that the two counts of murder should have been merged, the essence of such claim is that, in the absence of any evidence that the victim had been kidnapped, the Second Count of Petitioner's Indictment, charging felony murder in violation of N.Y. Penal Law § 125.25(1) based on her shooting death in furtherance of her kidnapping, should have been merged into the First Count, charging intentional murder in violation of N.Y. Penal Law § 125.25(3) based on the fact that she was killed after having been kidnapped. Petition ¶ 12(M) at 27. The Double Jeopardy Clause "applies both to successive punishments and to successive prosecutions for the same criminal offense." *United States v. Dixon*, 509 U.S. 688, 696, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993). Petitioner's assertion that no evidence was presented to the jury supporting the charged kidnapping is without merit. Rather, the evidence presented at trial included that the victim was scheduled to return to her dormitory room around noon on November 13, 1993, but never returned. Tr. at 933–36, 945–54, 1315–20. Rather, after making a transaction at an automatic teller machine and purchasing bagels from a store located in a shopping plaza in Pittsford, the Rochester suburb where the victim was abducted, the victim was observed being driven, against her will, in her vehicle in Rochester. Tr. at 964–73, 977–84, 997–98, 1012–1025, 1068–75, 1101–08, 2199. From this evidence, a reasonable jury could conclude that Petitioner had been abducted by Petitioner against her will, *i.e.*, was kidnapped, and was killed by Petitioner during her abduction, rather than returned to safety.[17]

---

17. As relevant to the instant case, pursuant to N.Y. Penal Law § 135.25[3], "[a] person is guilty of kidnapping in the first degree when he abducts another person and when: ... [t]he person dies during the abduction or before he is able to return or to be returned to safety."

Petitioner was convicted in a single trial of murder in the second degree and felony murder, for which he was sentenced to concurrent prison terms. Therefore, Petitioner has been neither punished more than once nor successively prosecuted for the same offense, and, accordingly, there has been no violation of the Double Jeopardy Clause. *Dixon,* 509 U.S. at 696–97, 113 S.Ct. 2849.

There is thus no basis to Petitioner's assertion that appellate counsel failed to render effective assistance by failing to argue that Petitioner's conviction of both Intentional Murder and Felony Murder was in violation of the merger doctrine and, as such, the Petition should be DISMISSED on this ground.

### N. Due Process—Writ of Error *Coram Nobis*

Petitioner alleges that he was denied due process when the Appellate Division failed to consider all the papers Petitioner filed in support of his motion for a writ of error *coram nobis.* Petition ¶ 12(N); Memorandum at 65. Respondent argues that in the absence of any basis upon which to find the Appellate Division failed to give adequate consideration to Petitioner's *coram nobis* motion, the Appellate Division's decision denying the motion "must be given great deference." Response at 34–35.

Petitioner's support for this ground consists solely of Petitioner's unsupported assertion that the Appellate Division did not read the memorandum of law and an exhibit submitted in support of his motion based on the fact that in the decision denying the motion, the court stated that it had read and deliberated upon several documents, including, *inter alia,* an affidavit by Petitioner, the notice of motion and proof of its service, and the reply affidavit of Petitioner, but does not specify Petition-

er's memorandum and the exhibit were also read. February 7, 2003 Order Denying Motion for Writ of Error *Coram Nobis,* Vol. II, Response Exh. V.

Although not specifically enumerated as among the papers considered by the court in deliberating on Petitioner's motion for a writ of error *coram nobis,* a finding that the court did not consider Petitioner's memorandum of law and attached exhibit submitted in support of the motion would, on this record, constitute sheer speculation, and a district court's grant of habeas relief "on the basis of speculation with slight support" would upset "the proper delicate balance between the federal courts and the States...." *Wood,* 516 U.S. at 8, 116 S.Ct. 7. Significantly, the order denying the motion does not state that no other papers were considered. Moreover, Petitioner points to no Supreme Court caselaw permitting the granting of habeas relief based on a state court's failure to consider specific papers on an *coram nobis* motion, and the court's research has revealed none. *See Williams,* 529 U.S. at 412, 120 S.Ct. 1495.

Accordingly, this ground for relief is without merit.

### O. Due Process—Stipulation as to 911 Audiotape

According to Petitioner, during trial, defense counsel Jacobs and the prosecutor stipulated, without any authority to do so, that the female voice heard on the audiotape of the 911 emergency call placed from the victim's cell phone was that of the victim. Petition ¶ 12(O); Memorandum at 66–70. According to Petitioner, such stipulation effectively transformed both prosecutor and defense counsel into unsworn witnesses and defense counsel, by stipulating to the voice identification, rendered ineffective assistance of counsel. *Id.* Respondent maintains this claim was not pre-

served for review, on either direct appeal or requests for post-conviction relief, and that, in any event, the decision to stipulate that it was the victim's voice heard on the 911 emergency call audiotape was a tactical decision by Petitioner's attorney not subject to habeas review. Response at 35–37.

According to the record, during trial, both prosecutor and defense counsel stipulated that the female voice heard on the 911 emergency call audiotape was that of the victim. Tr. at 2503. No objection to such stipulation was expressed by Petitioner at that time and Petitioner does not assert he failed to consult with him about such stipulation prior to its entry on the record; rather, Petitioner first objected to the stipulation in his *pro se* brief filed in support of the direct appeal. Vol. I, Response Exh. I, at 17, 19–22. The Appellate Division, in affirming Petitioner's convictions, found that Petitioner, by not objecting to the stipulation at trial, failed to preserve the claim for further review in violation of N.Y.Crim. Proc. Law § 470.05[2]. *Knight I*, 721 N.Y.S.2d at 169. A defense trial counsel's stipulation as to certain facts without his client's consent has been held not to constitute ineffective assistance of counsel sufficient to warrant habeas relief. *See Salcedo v. U.S.*, 1999 WL 335835, * 3 (S.D.N.Y. May 25, 1999) (stating with regard to 28 U.S.C. § 2255 habeas petition that "[t]he strategic decision to enter into a stipulation is one that defense counsel may make on the defendant's behalf ....") (citing *Brown v. Artuz*, 124 F.3d 73, 77 (2d Cir. 1997)). *See also Horan v. Conway*, 2007 WL 1087492, * 10 (N.D.N.Y. Apr.9, 2007) (same with regard to 28 U.S.C. § 2254 habeas petition).

▮ As discussed, Discussion, *supra*, at 275–76, a claim that has not been preserved for review by a timely objection at trial is procedurally barred from habeas review. *Garvey*, 485 F.3d at 713. Because Petitioner failed to preserve this claim, it cannot serve as a basis for habeas relief. Further, even if the claim had been preserved for review, insofar as Petitioner maintains that defense counsel, by not objecting to the stipulation, rendered ineffective assistance of counsel, Petitioner fails to establish that such stipulation was so deficient as a defense trial tactic as to prejudice Petitioner at trial in order to support an ineffective assistance of counsel claim. *Bunkley*, 68 F.3d at 1521. Rather, as Respondent points out, defense counsel's decision to stipulate to the challenged voice identification was sound legal strategy intended to avoid a highly emotional court scene in which the victim's family members would have to be called as witnesses to identify the voice during trial. Response at 35. Tellingly, Petitioner presents nothing in response to this explanation. As such, Petitioner is unable to overcome the "strong presumption" that his defense counsel's conduct in stipulating to the 911 tape voice identification fell "within the wide range of reasonable professional assistance," such that the challenged stipulation would not " 'be considered sound trial strategy.' " *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052 (quoting *Michel*, 350 U.S. at 101, 76 S.Ct. 158).

Thus, there is not merit to this ground for relief.

## P. Fingerprint Evidence

Petitioner challenges the admission into evidence of a fingerprint found inside the victim's vehicle. Petition ¶ 12(P); Memorandum at 70–75. In particular, Petitioner maintains that prior to his arrest, fingerprints that had been recovered from the victim's vehicle were compared, on three separate occasions, to Petitioner's prints with no reported match, but that after

Petitioner's arrest, police officer technician Robert Garland ("Garland") performed another fingerprint comparison and found a match. *Id.* Petitioner maintains that the belated "sudden match" resulted after Garland failed to follow proper fingerprint analysis procedures, and the folder in which the prints lifted from the victim's vehicle was not secured from tampering. *Id.* In opposition, Respondent maintains that this claim was not preserved and, thus, is procedurally barred from habeas review. Response at 36. Alternatively, Respondent asserts that this claim is without merit as Garland, a 25 year veteran of the Rochester Police Technician Unit, explained at trial that although the fingerprint that was eventually declared a match to Petitioner's fingerprint was initially deemed of "no value," it was established police procedure to subject prints to multiple analyses and the print was not compared to Petitioner's until after Petitioner's arrest, at which time it was declared a match by another technician, Scott Campbell ("Campbell"). *Id.* at 36–37. Campbell then requested Garland confirm the match, which Garland did. *Id.* at 37.

The trial transcript establishes that during trial, the prosecution presented an exhibit consisting of photographic display of two enlarged fingerprints side by side, including an unknown latent print photographed by Garland, and Petitioner's known fingerprint. Tr. at 2291–92. Both prints were highlighted to show the specific areas of similarity. *Id.* Defense counsel objected only to the highlighting, but not to the presentation of the display. *Id.* The Appellate Division, in affirming Petitioner's convictions, found that Petitioner, by failing to object to the stipulation at trial, failed to preserve the claim for further review in violation of N.Y.Crim. Proc. Law § 470.05[2]. *Knight I,* 721 N.Y.S.2d at 170.

As discussed, Discussion, *supra,* at 275–76, a claim that has not been preserved for review by a timely objection at trial is procedurally barred from habeas review. *Garvey,* 485 F.3d at 713. Even if such review had been preserved, a question of admissibility of fingerprint evidence comparison raises no issue of federal constitutional violation in the context of the plethora of other incriminating evidence against Petitioner, including Petitioner's admissions to Damian Smith and Reginald McGriff, identification testimony of eye witnesses and Petitioner's accomplices. *See Quartararo v. Hanslmaier,* 186 F.3d 91, 95 (2d Cir.1999) (holding in context of 28 U.S.C. § 2254 habeas petition that in light of other evidence placing petitioner in the empty field, the scene of murder for which petitioner had been convicted, including a ring, rusty scissors, cough drop, cigarette butt and matchbook, fact that no fingerprint evidence or hair of the petitioner were not found was inconsequential).

Because Petitioner failed to preserve this claim, it cannot serve as a basis for habeas relief.

### Q. Failure to Preserve Evidence

Petitioner maintains the trial court erroneously failed to preclude any evidence, including fingerprints, obtained from the victim's vehicle because the vehicle was not preserved for inspection by the defense. Petitioner ¶ 12(Q); Memorandum at 75–78. According to Petitioner, the prosecution's failure to make the vehicle available for inspection once an arrest was made violated the Petitioner's Fourteenth Amendment due process right. *Id.* Respondent asserts in opposition that prior to its disposal through auction, the vehicle was photographed and videotaped, with the photographs and videotapes provided to defense counsel, and the lack of opportunity to physically inspect the vehicle did not pre-

vent defense counsel from vigorously cross-examining testifying police officers and technicians at trial regarding any evidence obtained from the vehicle, including fingerprint evidence. Response at 38–39. Further, the trial court's denial of Petitioner's motion to suppress evidence obtained from the victim's vehicle is a state court evidentiary ruling not cognizable on a federal habeas petition. *Id.* at 39.

The state court's determination as to evidentiary matters is presumed to be correct unless the federal habeas court concludes that the relevant state court determination is not fairly supported by the record, *Sumner,* 449 U.S. at 546–47, 101 S.Ct. 764. First, as discussed, Discussion, *supra,* at 273, evidentiary rulings by state trial and appellate courts are presumed to be correct unless the federal habeas court concludes that the relevant state court determination is not fairly supported by the record. *Sumner,* 449 U.S. at 546–47, 101 S.Ct. 764. Evidence may be considered erroneously admitted into evidence and thus supporting habeas relief only when, viewed objectively in light of the entire record before the jury, it was "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Collins,* 755 F.2d at 19. For a habeas petitioner to prevail on a claim that an evidentiary error amounted to a deprivation of due process, he must show that the error was so persuasive as to have deprived him of a fundamentally fair trial. *United States v. Agurs,* 427 U.S. 97, 108, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

 Insofar as Petitioner maintains the prosecution's failure to preserve the victim's vehicle to permit a physical inspection by a defendant upon an eventual arrest, "[w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that

might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must possess an *exculpatory value* that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta,* 467 U.S. 479, 488–89, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) (footnote and citation omitted, underlining added). Moreover, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process law." *Arizona v. Youngblood,* 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1989).

 In the instant case, Petitioner has failed to sustain his burden to establish either that the trial court's ruling denying Petitioner's motion seeking to preclude evidence from the vehicle was erroneous, *see Williams,* 529 U.S. at 412, 120 S.Ct. 1495, or that the failure to preserve the vehicle deprived Petitioner of due process under the Fourteenth Amendment. Specifically, the vehicle was not, itself, evidence; rather, the fingerprints taken from the vehicle, which constituted evidence, were preserved for Petitioner's inspection. Petitioner does not explain how having the vehicle from which the fingerprints were obtained available for physical examination could reasonably have provided Petitioner with exculpatory evidence. Nor does Petitioner point to anything indicating the vehicle's disposal was done in bad faith. Moreover, that the vehicle was thoroughly photographed and videotaped prior to its disposal, and that defense counsel was permitted to view the photographs and videotapes further weighs against a finding that the vehicle's disposal occurred in bad faith.

Accordingly, there is no merit to this ground for relief.

### R. Weight of the Evidence

According to Petitioner, the guilty verdict was against the weight of the evidence presented at trial because no "unassailable physical evidence links petitioner to the November 13, 1993 shooting" and the evidence that was presented was not credible Petition ¶ 12(R); Memorandum at 78–81. In particular, Petitioner maintains that significant questions exist regarding the reliability of the DNA evidence, the veracity of the fingerprint analysis, the identifications of Petitioner by Michael Smith and Robert Geer, and the origin of the 911 emergency call, and that no evidence was presented that any rape or kidnapping occurred. *Id.* Respondent asserts in opposition that there is no merit to these claims given that the proof at trial was overwhelming and, in any event, the claim was not preserved for habeas review. Response at 40–44.

 "A habeas petitioner challenging the sufficiency of the evidence supporting his conviction bears a heavy burden." *Knapp v. Leonardo,* 46 F.3d 170, 178 (2d Cir.), *cert. denied,* 515 U.S. 1136, 115 S.Ct. 2566, 132 L.Ed.2d 818 (1995). The standard to be applied in a federal habeas corpus petition when the claim is made that the petitioner has been convicted in state court on insufficient evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In considering the sufficiency of the trial evidence on a habeas petition attacking a conviction, the court is required to look to the relevant state law to determine the elements of the crime. *Quartararo v. Hanslmaier,* 186 F.3d 91, 97 (2d Cir.1999). Where facts presented at trial support conflicting inferences, a fed-

eral habeas court must presume that conflicts were resolved in favor of the prosecution. *Jackson, supra,* at 326, 99 S.Ct. 2781. The court is not required to decide whether it believes that the evidence at trial established guilt beyond a reasonable doubt, but whether any rational trier of fact could have found guilt beyond a reasonable doubt based on the evidence presented. *See Jackson, supra,* at 319, 99 S.Ct. 2781. In making this assessment, a federal habeas court must "credit every inference that could have been drawn in the state's favor ... whether the evidence being reviewed is direct or circumstantial." *Reddy v. Coombe,* 846 F.2d 866, 869 (2d Cir.1988), *cert. denied,* 488 U.S. 929, 109 S.Ct. 316, 102 L.Ed.2d 334 (1988). The court is also permitted to "draw reasonable inferences from basic facts to ultimate facts." *Jackson, supra,* at 319, 99 S.Ct. 2781. The instant record demonstrates sufficient evidence supports Petitioner's conviction of intentional murder, felony murder and rape.

Pursuant to New York law and as relevant to the instant case, a person is guilty of Intentional Murder in the Second Degree when "[w]ith intent to cause the death of another person, he causes the death of such person ...." A person is guilty of Felony Murder in the second degree, in violation of N.Y. Penal Law § 125.25(3), when, "[a]cting either alone or with one or more other persons, he commits or attempts to commit ... kidnapping ... and, in the court of and *in furtherance of such crime or of immediate flight therefrom,* he, or another participant, if there be any, causes the death of a person other than one of the participants...." N.Y. Penal Law § 125.25(1) (underlying added). A person is guilty of Rape in the First Degree in violation of N.Y. Penal Law § 130.35(1) when he "engaged in sexual intercourse with another person by forc-

ible compulsion...." N.Y. Penal Law § 130.35[1].

In the instant case, the plethora of evidence at trial established that the victim had been killed by two gunshots to the head, establishing the elements of the second degree intentional murder charge. That the victim was murdered following her kidnapping and while she remained abducted was established by the fact that the victim had purchased bagels and conducted a banking transaction at an ATM located in a plaza in the Rochester suburb of Pittsford, New York, and shortly thereafter was observed by several eyewitnesses being driven, against her will, in her vehicle in Rochester, while screaming for assistance to escape the attackers, in satisfaction of the second degree felony murder charge. Finally, that the victim had been raped was established by the fact that when discovered, the victim was dressed in clothing other than what she had been last observed wearing, discovery of Petitioner's semen on the victim, evidence that sperm found inside the victim was from a recent ejaculation, and the victim's body had been brutally beaten, her feet were dirty with brick residue and other types of debris found in her clothing, in satisfaction of the first degree rape conviction. Evidence of the circumstances of the shooting include that the victim was shot three times at close range with a rifle, including one shot through the middle of her forehead, one to the back of the head, and another into her left upper back. Thus, a reasonable jury could find that the victim was intentionally killed and that her death was in furtherance of her kidnapping. Moreover, the evidence supports the jury's finding that the victim was, prior to her death, raped by Petitioner.

Significantly, Petitioner does not deny that the evidence presented at trial, if construed in favor of the prosecution, was sufficient to convict Petitioner on all three criminal counts. Rather, Petitioner's argument in support of this claim is largely based on the fact that none of the evidence proffered at trial was "unassailable." Memorandum at 79. There is, however, no requirement that a criminal jury resolve evidentiary inconsistencies in the defendant's favor; instead, conviction of a criminal offense requires proof of the defendant's guilt beyond a reasonable doubt and the court is not required to resolve evidentiary inconsistencies in favor of the defendant. *See United States v. Walsh,* 194 F.3d 37, 52 (2d Cir.1999) (denying motion to vacate judgment as against the weight of the evidence based on inconsistent testimony as it is within jury's province to resolve evidentiary inconsistencies against defendant).

This ground for relief is therefore meritless.

## S. Excessive Sentence

Petitioner maintains that the sentence imposed for the rape conviction should run concurrent with, rather than consecutive to, the concurrent sentences imposed for the two murder convictions. Petition ¶ 12(S); Memorandum at 81–83. Petitioner also maintains that the only evidence presented in support of the rape charge was the DNA evidence which, without more, is insufficient to support the rape conviction. *Id.* In opposition, Respondent asserts that Petitioner's claim that his sentences for rape and murder must run concurrently was rejected by the Appellate Division and, further, presents only a state issue not reviewable under federal habeas corpus. Response at 44.

Initially, Petitioner's assertion that only evidence presented in support of the rape charge was DNA evidence is without merit. According to Damian Smith's trial testimony, the voices on the 911 call audio-

tape establish that the victim was pleading with Petitioner not to rape her. Tr. at 2200–03.

Further, because Petitioner's sentence is within the state sentencing parameters for the crimes for which he was convicted, no violation of federal due process has occurred. *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir.1992) (holding that, "[n]o federal Constitutional issue is presented where ... the sentence is within the range prescribed by state law"). As Class A–I felonies, N.Y. Penal Law §§ 125.25[1] and [3], including the charges upon which Petitioner was convicted, the maximum sentence for a conviction of a single count of murder in the second degree is life imprisonment. N.Y. Penal Law § 70.00[2](a). As a class B felony, the maximum sentence for a conviction of a single count of rape in the first degree is 25 years. N.Y. Penal Law § 70.00[2](b). Because Petitioner's sentences fall within the ranges prescribed by the New York Penal Law for the crimes for which he was convicted, his claim that the sentence is harsh and excessive fails to state a claim upon which habeas relief may be granted.

This ground for relief is accordingly unavailing.

## T. Ineffective Assistance of Trial Counsel

Petitioner alleges he was deprived of effective assistance of trial counsel when Jacobs failed to (1) move for change of venue; (2) call Reginald McGriff and Eugene French as defense witnesses; (3) call any member of the Federal Bureau of Investigation ("FBI") regarding the inaudibility and veracity of the original 911 tape recording; (4) independently analyze any of the 911 call recording; (5) request a pretrial hearing pursuant to *People v. Castro*, 143 Misc.2d 276, 540 N.Y.S.2d 143 (S.Ct., Bronx Co.1989) (requiring pretrial hearing be held to determine admissibility of new scientific evidence) and *Frye v. United States*, 293 F. 1013 (Ct.App.D.C. 1923) (permitting expert testimony deduced from scientific principle or discovery only where the thing from which such deduction is made is sufficiently established as having gained general acceptance in the field to which it belongs); (6) obtain independent testing of physical evidence; (7) produce tape of televised interview with television station WHEC–TV depicting Damian Smith and Reginald McGriff stating Petitioner did not commit the crimes; (8) call neighbors to testify as to having seen the victim's vehicle in Petitioner's neighborhood prior to November 13, 1993; (9) investigate why the fingerprint lifted from the victim's vehicle was not analyzed until May 16, 1994, and why multiple photographs of Petitioner were in the police computer system prior to Petitioner's arrest; (10) reopen the *Wade* hearing to present newly discovered evidence; (11) call law enforcement officials with the Rochester Police Department who contacted and scheduled press conferences with local news stations following Petitioner's arrest; (12) prepare known defense witnesses for trial; (13) object to and, instead, stipulated with prosecution that the voice on 911 emergency call audiotape was that of the victim; (14) request a missing witness charge when the prosecution failed to call Reginald McGriff to testify; and (15) assert the total lack of proof relative to any element of the kidnapping charge. Petition ¶ 12(T); Memorandum at 84–86. In opposition, Respondent argues that Petitioner has failed to meet the burden of establishing any colorable Sixth Amendment right to effective assistance of counsel violation. Response at 45–46.

As discussed, Discussion, *supra*, at 290, a petitioner seeking habeas relief based on ineffective assistance of counsel in viola-

tion of the Sixth Amendment must overcome a "strong presumption" that "(1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense." *Bunkley*, 68 F.3d at 1521 (citing *Strickland*, 466 U.S. at 688, 694, 104 S.Ct. 2052). The petitioner must also overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. In the instant case, Petitioner has failed to meet the burden of overcoming this "strong presumption" with regard to any of the 15 separately articulated bases for Petitioner's ineffective assistance of trial counsel claim. In fact, Petitioner does not explain how any of these 15 asserted instances of inadequate counsel could support such a claim, and it is not the court's duty to construct an argument that Petitioner has failed to present. *See Garcia v. Warden, Dannemora Correctional Facility*, 613 F.Supp. 302, 306 (S.D.N.Y.1985) (finding it inappropriate for court to "scour the record in search of some justification for petitioner's default, or to construct an 'actual prejudice' argument for him."), *aff'd*, 795 F.2d 5 (2d Cir.1986).

Rather, the record establishes that Jacobs represented Petitioner with commendable zeal. In particular, Jacobs extensively challenged the reliability of the DNA and fingerprint evidence, and each witness's recollection. Tr. at 1596–1620, 1628–29, 1724–1890, 1935–47, 2031–69, 2094–2105 (cross examination regarding DNA); Tr. at 2330–53, 2430–44, 2447–49 (cross examination regarding fingerprint evidence). Jacobs also cross-examined each prosecution witness, presenting evidence in an attempt to impeach each witnesses, including evidence of criminal records and the possibility that deals may have been made with law enforcement officials in exchange for testimony against Petitioner, and attempted to elicit alibi testimony for Petitioner. Jacobs further made numerous objections to the prosecutor's questions, many of which were sustained by Justice Affronti. In sum, the record fails to establish that Jacobs was remiss in any respect of consequence in his representation of Petitioner in this daunting case.

There is thus no merit to this ground.

## CONCLUSION

Based on the foregoing, the court finds none of Petitioner's grounds for relief have any merit and, accordingly, the Petition should be DISMISSED.

Further, as the court finds there is no substantial question presented for appellate review, a certificate of appealability should not issue. 28 U.S.C. § 2253, as amended by the Antiterrorism and Effective Death Penalty Act of 1996.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

***Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.*** *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Limited*, 838 F.2d 55 (2d Cir.1988).

SO ORDERED.

September 26, 2007.